WILLIAM A. SAWELSON AND SHARON SAWELSON, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

MELVIN G. SAWELSON AND EILEEN SAWELSON, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 212–70, 213–70.   Filed October 29, 1973.

*Bruce I. Hochman*, for the petitioners.
*Richard W. Janes* and *Richard H. Gannon*, for the respondent.

DAWSON, *Judge:* *In these consolidated cases respondent determined deficiencies in petitioners' Federal income taxes for their taxable year ended January 31, 1965, as follows:

| Petitioners | Docket No. | Deficiency |
| --- | --- | --- |
| William A. Sawelson and Sharon Sawelson | 212–70 | $2, 101. 67 |
| Melvin G. Sawelson and Eileen Sawelson | 213–70 | 4, 266. 14 |

Several adjustments have been conceded. The only issue presented for decision is whether the cash distributed to petitioners on partial redemption of their stock was essentially equivalent to a dividend and therefore taxable as ordinary income rather than capital gain as reported.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Melvin G. Sawelson and Eileen Sawelson were husband and wife who resided in Los Angeles, Calif., during their taxable year ended January 31, 1965, and at the time the petition was filed herein. Their

---

*Pursuant to a notice of reassignment sent to counsel for the parties, and to which no objections were filed, these cases were reassigned on Oct. 10, 1973, from Judge Austin Hoyt to Judge Howard A. Dawson, Jr., for disposition.

joint Federal income tax return for that fiscal year was timely filed with the district director of internal revenue at Los Angeles, Calif.

William A. Sawelson and Sharon Sawelson were husband and wife who resided in Los Angeles, Calif., for the fiscal year ended January 31, 1965, and at the time the petition was filed herein. Their joint Federal income tax return for that fiscal year was timely filed with the district director of internal revenue at Los Angeles.

Acme Film Laboratories, Inc. (Acme), is a California corporation which at all times material herein had only one class of common stock and no other class of stock outstanding. As of April 21, 1964, the outstanding common stock was held as follows:

| | | |
|---|---:|---:|
| Sam Sawelson | 56, 309 | |
| Sam and Anna Sawelson Trust | 18, 050 | |
| Melvin G. Sawelson | 39, 050 | |
| William A. Sawelson | 19, 500 | |
| Total shares held by Sawelson family | | 132, 909 |
| Charles J. Ver Halen | 15, 571 | |
| Other minority shareholders (20, all unrelated to the petitioners herein) | 10, 800 | |
| Total minority shares | | 26, 371 |
| Total shares outstanding | | 159, 280 |

Sam and Anna Sawelson are the parents of Melvin G. and William A. Sawelson.

During the taxable year in question the petitioners Melvin G. and William A. Sawelson each had a beneficial interest in the Sam and Anna Sawelson Trust.[1]

For several years prior to April 7, 1964, Charles J. Ver Halen (Ver Halen), a minority stockholder, had been making various threats about suing Acme, and had been for some years a direct competitor of Acme. He had also on a number of occasions employed Acme employees to Acme's detriment.

Robert G. Taylor (Taylor), counsel for Acme, recommended that Acme reacquire the stock of Ver Halen to eliminate him as a source of frustration and to end his potential access to confidential information. In fairness to the minority shareholders, Taylor recommended that an offer be made to the other minority shareholders to redeem their stock on precisely the same terms as were offered to Ver Halen. Taylor was not concerned about fairness with respect to Ver Halen since the latter was represented by his own counsel.

---

[1] The record is not clear as to the petitioners' respective interests in the trust. Since all the briefs are based on the assumption that each son had a 50-percent interest therein and since the Commissioner did not question the division of the trust income on that basis, as reported on petitioners' returns, we have assumed that each brother had a 50-percent interest in the trust.

On being advised that the corporation might soon be acquired by another company, Taylor further recommended that the offer of redemption be extended to the Sawelsons as a group in order to avoid the charge, upon subsequent sale, of an unfair aggrandizement of the majority stock by virtue of not having participated in the prior redemption. The objective was to have the Sawelsons participate in the redemption so that they would have the same approximate proportionate ownership in Acme after the redemption as they had before.

On April 7, 1964, Acme's board of directors adopted, and its shareholders approved, a resolution authorizing the company's officers to offer to purchase up to 40,000 shares of Acme stock at a price of $1.95 per share. The offer was extended to all shareholders, with a 13,629-share limitation on the number of shares to be purchased from those shares owned or controlled by Acme's directors. On April 7, 1964, Acme's directors were Samuel Sawelson, Melvin G. Sawelson, William A. Sawelson, and David L. Christopher. This offer to purchase Acme's shares was extended to Acme's shareholders by letter dated April 21, 1964. Two reasons were given in the offer for the limitations on the total number of shares to be redeemed and the number to be redeemed from the directors—"so that the total repurchase obligation [would] not impair the ability of the corporation to satisfy its obligations as they fall due" and to preserve capital which "could be used to great advantage in the business to enhance its earning power."

Shortly after April 24, 1964, Acme redeemed 29,271 shares of its stock pursuant to its offer of redemption at $1.95 per share. The shares of Melvin G. Sawelson and William Sawelson were purchased by Acme on May 1, 1964. Immediately after the redemption, the outstanding stock of Acme was 130,009 shares. Of this number, 8,600 shares were held by the minority shareholders other than Ver Halen, whose stock interest had been fully redeemed. The impact of the redemption on the three groups of shareholders (i.e., the Sawelsons, Ver Halen, and the other minority shareholders) was as follows:

| | Shares prior to redemption | Percent | Shares redeemed | Percent | Shares after redemption | Percent |
|---|---|---|---|---|---|---|
| Sawelson Family: | | | | | | |
| Sam Sawelson | 56,309 | | ------------- | | 56,309 | |
| Sam and Anna Sawelson Trust | 18,050 | | ----------- | | 18,050 | |
| Melvin G. Sawelson | 39,050 | | 7,000 | | 32,050 | |
| William A. Sawelson | 19,500 | | 4,500 | | 15,000 | |
| Total Sawelson shares | 132,909 | 83.4 | 11,500 | 39.3 | 121,409 | 93.4 |
| C. J. Ver Halen | 15,571 | 9.8 | 15,571 | 53.2 | 0 | 0 |
| Other minority stockholders | 10,800 | 6.8 | 2,200 | 7.5 | 8,600 | 6.6 |
| | 159,280 | 100.0 | 29,271 | 100.0 | 130,009 | 100.0 |

As a result of this redemption, the proportionate interest of the Sawelson family increased from 83.4 percent to 93.4 percent of outstanding shares.

The petitioners herein treated the amounts received in redemption as distributions in exchange for their stock and reported the difference between the amounts received and their bases in the shares redeemed as long-term capital gains.

In his statutory notices of deficiencies dated December 4, 1969,[2] relating to petitioners' fiscal year ended January 31, 1965, respondent determined the following deficiencies in their income taxes resulting from, among other items not at issue herein, the treatment of the amount received from Acme as a taxable dividend under sections 301 and 316 of the Internal Revenue Code of 1954,[3] rather than as a redemption of stock to be treated as an exchange:

| | Amount received from Acme on redemption of stock | Deficiency determined by respondent [1] |
|---|---|---|
| William A. and Sharon Sawelson | $8,775 | $2,101.67 |
| Melvin G. and Eileen Sawelson | 13,650 | 4,266.14 |

[1] This figure includes other adjustments, not at issue here, in addition to the alleged dividend.

### ULTIMATE FINDING

The partial redemption of petitioners' stock by Acme did not meaningfully reduce their proportionate interests in the corporation; therefore, the cash distributions from Acme to petitioners were essentially equivalent to a dividend, taxable as ordinary income.

### OPINION

As a general rule, distribution of property by a corporation to its shareholders is treated, pursuant to sections 301 and 316, as a dividend out of earnings and profits to the extent of such earnings. One exception to this general rule is for certain distributions in redemption of a corporation's stock. Section 302(a) treats such distributions as "payment in exchange for stock," taxable as capital gain, if the requirements of one of the four paragraphs of subsection 302(b) are met.

Petitioners have not contended that the redemption fits within any of the "safe harbors" provided by section 302(b) other than section 302(b)(1), nor is there anything in the record which would support such an argument. Thus the only issue here is whether the distribu-

---

[2] While petitioners raised a statute of limitations issue in their petitions, respondent alleged in his answer that a series of Forms 872 had been timely and validly executed which extended the statutory period to Dec. 31, 1969. Petitioners did not raise this issue at trial nor on brief. We therefore conclude that the petitioners no longer contest this issue and decide that the statutory notices were timely issued.

[3] Unless otherwise indicated all section references are to the Internal Revenue Code of 1954, as amended.

tions in question are "not essentially equivalent to a dividend" within the meaning of section 302(b) (1).

The relevant provisions of section 302 are as follows:

(a) * * *. If a corporation redeems its stock * * * and if paragraph (1) * * * of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.

(b) REDEMPTIONS TREATED AS EXCHANGES.—

(1) * * *. Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend.

In order to "qualify for preferred treatment under [section 302] (b) (1)], a redemption must result in a meaningful reduction of the shareholder's proportionate interest in the corporation." *United States v. Davis*, 397 U.S. 301, 313 (1970). In the *Davis* case a 50-percent shareholder purchased an entire issue of preferred stock to provide the corporation with sufficient capital to qualify it for an RFC loan. Later, he bought the remaining outstanding common stock of the corporation and divided it between his two children. Upon repayment of the RFC loan 17 years later, the corporation redeemed Davis' preferred stock for his basis therein, as was contemplated at the time the preferred stock was issued.

The Supreme Court held that the attribution rules of section 318 apply to section 302(b) (1), that motive or business purpose is irrelevant in determining dividend equivalence, and that the sole inquiry in a 302(b) (1) case should be the narrow one of whether or not the redemption could be characterized as a sale. Since Davis owned 100 percent of the common stock both before and after the redemption of the preferred, the Supreme Court concluded that the case was simply one where a sole shareholder has part of his stock reduced by his corporation and that this is always equivalent to a dividend.

Unlike *Davis*, this case involves the redemption of stock of more than one shareholder. In addition to the shares redeemed by the petitioners, the stock of other shareholders was redeemed. Despite the redemption of petitioners' stock, their proportionate interests in Acme increased. This fact controls the disposition of this case.

Section 302(c) provides that, except in certain instances involving complete termination of a shareholder's interest in a corporation, "section 318(a) shall apply in determining the ownership of stock for purposes of" section 302. *Davis* affirmed that this rule necessarily applied to section 302(b) (1). Under the provisions of section 318(a) (1), an individual constructively owns the stock owned, directly or indirectly, by his parents, spouse, children, and grandchildren. Section 318(a) (2) (B) further provides that stock owned by a trust is constructively owned by its beneficiaries. And sections 318(a) (2) (B) and 318(a) (5), as they applied to redemptions occurring before August 1,

1964, attributed *shares owned by one trust beneficiary sideways, through the trust, to the other trust beneficiaries in the same proportion as their interests in the trust. See *Baker Commodities, Inc.* v. *Commissioner*, 415 F.2d 519 (C.A. 9, 1969), affirming 48 T.C. 374 (1967), certiorari denied 397 U.S. 988 (1970). By thus attributing the shares owned by their parents, 50 percent of the shares owned by the trust, and 50 percent of the other brother's shares (sideways, through the trust, in the same proportion as their interests in the trust) to each brother, Melvin and William Sawelson increased their respective proportionate interests in Acme by 9 percent and 8.6 percent, as can be seen from the following table:

| | Ownership of Acme stock prior to redemption | | Ownership of Acme stock after redemption | |
|---|---|---|---|---|
| | Melvin G. Sawelson | William A. Sawelson | Melvin G. Sawelson | William A. Sawelson |
| Shares owned outright | 39,050 | 19,500 | 32,050 | 15,000 |
| Shares owned constructively by application of section 318: | | | | |
| (1) 100% of shares owned by Sam Sawelson (father) 318(a)(1)(A)(ii) | 56,309 | 56,309 | 56,309 | 56,309 |
| (2) 50% of shares owned by Sam and Anna Sawelson Trust 318(a)(2)(B)(i) | 9,025 | 9,025 | 9,025 | 9,025 |
| (3) 50% of shares owned by brother—double attribution through the trust-318(a)(2)(B) and 318(a)(5) | 9,750 | 19,525 | 7,500 | 16,025 |
| Total shares attributable before/after the redemption | 114,134 | 104,359 | 104,884 | 96,359 |
| Total shares outstanding | 159,280 | | 130,009 | |
| Percentage of shares attributable | 114,134 or 71.7% | 104,359 or 65.5% | 104,884 or 80.7% | 96,359 or 74.1% |
| | 159,280 | 159,280 | 130,009 | 130,009 |

| | Comparison of proportionate changes in ownership | |
|---|---|---|
| | Melvin G. Sawelson | William A. Sawelson |
| Before | 71.7% | 65.5% |
| After | 80.7% | 74.1% |
| Increase as a result of the redemption | 9.0% | 8.6% |

Whether the redemption of petitioners' stock is examined with a view to characterizing it as either a sale or a dividend, or whether the "meaningful reduction" test is applied, the result is the same, i.e., the petitioners are not entitled to capital gains treatment. A redemption resulting in an increase to a redeeming shareholder's proportionate interest is "most unlike a sale." *Levin* v. *Commissioner*, 385 F.2d 521, 527 (C.A. 2, 1967), affirming 47 T.C. 258 (1966). See also Bittker

& Eustice, Federal Income Taxation of Corporations and Shareholders 9–2 (3d ed. 1971). As a result of the redemption, petitioners' constructive power to control Acme's affairs increased, as did their right to share in the company's profits. They parted with nothing. As pointed out in *Levin*,[4] prior to the Supreme Court's decision in *Davis:*

when a taxpayer's (constructive) ownership decreases by a significant amount, we are justified in concluding that a substantial reduction in taxpayer's interest in the corporation has occurred warranting capital gain treatment as a sale or exchange. But when only a small reduction in control occurs, the distribution has been held to be essentially equivalent to a dividend; *a fortiori*, when no reduction, but rather an increase, in control occurs, taxpayer has not parted with anything justifying capital gain treatment. [385 F.2d at 527–528.]

Here the petitioners increased their right to share in corporate profits and also realized cash. As the Supreme Court concluded in *Davis:*

If a corporation distributes property as a simple dividend, the effect is to transfer the property from the company to its shareholders without a change in the relative economic interests or rights of the stockholders. Where a redemption has that same effect, it cannot be said to have satisfied the "not essentially equivalent to a dividend" requirement of § 302(b)(1). Rather, to qualify for preferred treatment under that section, a redemption must result in a meaningful reduction of the shareholder's proportionate interest in the corporation. * * * [397 U.S. at 313.]

Because the partial redemption of petitioners' stock did not meaningfully reduce their proportionate interests in Acme, the cash distribution was essentially equivalent to a dividend and taxable as ordinary income.[5]

---

[4] While not explicitly adopted by the Supreme Court in *Davis,* the *Levin* case was cited as the opinion representing the Second Circuit's position in sec. 302(b)(1) cases, 397 U.S. at 303 fn. 2, a position which was implicitly adopted in *Davis.*

[5] Even disregarding the application of the attribution rules, there was no meaningful reduction of petitioners' interests:

|  | Shares prior | Percentage | Shares after | Percentage |
|---|---|---|---|---|
| Melvin Sawelson | 39,050 |  | 32,050 |  |
| Total outstanding | 159,280 | 24.5 | 130,009 | 14.6 |
| William Sawelson | 19,500 |  | 15,000 |  |
| Total outstanding | 159,280 | 12.24 | 130,009 | 11.5 |

As shown above, prior to the redemption, Melvin Sawelson owned 24.5 percent of the Acme shares outstanding. After the redemption he owned 24.65 percent, a net increase of .15 percent. Prior to the redemption, William Sawelson owned 12.24 percent of the company's shares outstanding: afterwards he owned 11.5 percent, a net decrease of .74 percent. Yet, each brother realized cash on the transaction. Regardless of whether the business-purpose test, which was discarded in *Davis,* is applied, a purposeless redemption, the *net effect* of which was to distribute cash to shareholders without a "meaningful reduction" of the recipient-shareholder's proportionate interest in the corporation is revealed.

Petitioners argue that *Davis* does not totally preempt all factual considerations of business purpose. However, the language of the Supreme Court is without ambiguity:

Congress clearly mandated that pro rata distributions [6] be treated under the general rules laid down in §§ 301 and 316 rather than under § 302, and nothing suggests that there should be a different result if there were a "business purpose" for the redemption. * * * we agree with the * * * Second Circuit that "the business purpose of a transaction is irrelevant in determining dividend equivalence" under § 302(b)(1). *Hasbrook* v. *United States*, 343 F.2d 811, 814 (1965). [397 U.S. at 312.]

Even if we assume *arguendo* that Acme had a legitimate purpose in offering to redeem the Ver Halen stock, no such purpose has been shown for extending the redemption to the petitioners. Taylor, Acme's attorney, felt that limiting the redemption to Ver Halen would be unfair to those minority shareholders who might want to redeem. But the possibility that the company might be sold shortly after the redemption created the further problem that the Sawelsons, by not participating in the redemption, might later be accused of unfair aggrandizement. He thought this objection could be overcome only by including the Sawelsons in the redemption.

In the first place, Acme had no interest in whether the Sawelsons benefited disproportionately from the later sale. Any difference between book value and the selling price belonged to the shareholders and any suit by the aggrieved minority shareholders would be against the Sawelsons, even though the corporation would be named as nominal plaintiff if a derivative suit rather than an individual action were maintained. In either case the Sawelsons would be the defendants, not the corporation, since the cause of action would be for violation of duties as officers and directors. Further, it is clear that the minority could have been adequately protected without including the Sawelsons in the redemption offer by making a full disclosure in the redemption offer of the possibility that Acme might be purchased by another corporation soon after the redemption. Finally, the redemption of 11,500 shares by the majority was inconsistent with the avowed corporate purpose of preserving capital as stated in the cover letter for the offer of redemption.

Failing in their attempt to have business purpose considered, petitioners seek to distinguish *Davis* on several grounds. First, they argue that *Davis* should be restricted to its facts, the one-man corporation. Since *Davis* does not support such a distinction, we reject this without

---

[6] To escape characterization as a pro rata distribution, "a redemption must result in a meaningful reduction of the shareholder's proportionate interest in the corporation." (397 U.S. at 313.)

further discussion. See *Coates Trust* v. *Commissioner*, 480 F.2d 468 (C.A. 9, 1973), affirming 55 T.C. 501 (1971).

Next, petitioners argue that Acme did not pursue RFC financing or initiate any type of comparable activity and that it only reacted to a problem. The distinction between an affirmative act and a reaction is a distinction without substance. To the extent business purpose is relevant as an indicia of dividend equivalency, the only question is whether any corporate purpose for the redemption predominated over shareholder purpose. Since the business-purpose test has been laid to rest by *Davis*, such a distinction is no longer relevant.

Lastly, petitioners argue that the control group did not exercise its power for its own purposes, that respondent seeks to deny closely held corporations the flexibility needed to work out intelligent non-litigious solutions and that respondent is elevating form over substance.

The Supreme Court made this reply to the taxpayer's form over substance argument in *Davis*, which seems quite suitable here:

the difference between form and substance in the tax law is largely problematical, and taxpayer's complaints have little to do with whether a business purpose is relevant under § 302(b)(1). It was clearly proper for Congress to treat distributions generally as taxable dividends when made out of earnings and profits and then to prevent avoidance of that result without regard to motivation where the distribution is in exchange for redeemed stock. [397 U.S. at 312–313.]

In our judgment the *Davis* case should not be limited to its facts [7] (where the redeeming shareholder owns 100 percent of the corporation's stock both before and after the redemption). The "meaningful reduction" test deserves wider application since the reasoning behind the decision transcends the narrow facts of the case.

Since petitioners cannot successfully distinguish the instant case from *Davis*, we conclude that *Davis* is controlling here. Accordingly, we hold that the cash distribution in redemption of petitioners' stock is properly treated under sections 301 and 316 and thus taxable as ordinary income.

*Decisions will be entered for the respondent.*

---

[7] See Bittker & Eustice, *Federal Income Taxation of Corporations and Shareholders* 9-26 (3d ed. 1971).