JACK O. CHERTKOF AND SOPHIE CHERTKOF, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2345–75.    Filed September 18, 1979.

*Lawrence M. Katz,* for the petitioners.
*Arnold E. Kaufman,* for the respondent.

WILES, *Judge:* Respondent determined a deficiency of $229,390.71 in petitioners' 1966 Federal income tax.[1] The issues for decision are the fair market value of a corporate distribution to petitioner Jack Chertkof of an undivided one-third interest in real property in redemption of his stock in E & T Realty Co., and whether the redemption constituted a complete termination of

---

[1] In *Chertkof v. Commissioner,* 66 T.C. 496 (1976), we held that the deficiency involved in this case was not barred by the statute of limitations.

his interest in the corporation within the meaning of section 302(b)(3)[2] and the 10-year rule of section 302(c)(2)(A).

## FINDINGS OF FACT

Some facts were stipulated and are found accordingly.

Jack O. (hereinafter petitioner) and Sophie Chertkof, husband and wife, were residents of Pikesville, Md., when they filed their 1966 joint Federal return with the District Director of Internal Revenue, Baltimore, Md., and of Baltimore, Md., when they filed their petition in this case.

In 1941, petitioner, his father, David Chertkof (hereinafter David), and Wallace Smith organized E & T Realty Co. (hereinafter E & T), which constructed, owned, and operated the Essex Shopping Center—a complex of retail stores and parking areas located in the Essex area of Baltimore County, Md. Petitioner, his father, and Smith owned the stock 20, 40, and 40 percent, respectively. Smith and David ran E & T's corporate affairs until Smith's death in 1947. Thereafter David assumed management control. Smith's stock was retired upon his death.

After Smith's death, conflicts arose between petitioner and his father over the management of E & T and its major asset, the Essex Shopping Center. In 1965, after continuing disagreements between the two and the failure of either to buy the other out, they agreed E & T would redeem all of petitioner's stock. Petitioner was to receive a one-third undivided interest in E & T's real estate owned on August 31, 1965, subject to a prorata share of the liabilities, plus one-third of the remaining assets, subject to liabilities. They executed a redemption agreement dated July 12, 1965.

As of August 31, 1965, the subject properties consisted of 28 lots in four contiguous parcels in a blue collar, predominantly white area located along Eastern, Maryland, South Taylor, and Margaret Avenues in Essex, Md.

*Parcel No. 1.*—439–451 Eastern Avenue (Block J, Lots 18–23). Lots 18, 19, and 20, on the northwest corner of the intersection of Maryland and South Taylor Avenues, were improved by a paved parking lot of approximately 21,025 square feet. Lots 21, 22, and 23, on the southwest corner of the intersection of Eastern and

---

[2]Statutory references are to the Internal Revenue Code of 1954, as amended.

Taylor Avenues, were improved by brick and concrete buildings built in 1947, with approximately 22,500 square feet of rentable space. Tenants of these properties and the terms of their occupancy were as follows:

(1) 443–451 Eastern Avenue; Slatkoff-Tuvin, Inc.; printer, approximately 10,000 sq. ft.; lease 5/1/64–4/30/65. Tenant exercised option to 4/30/66. $500 per month rent.

(2) 439 Eastern Avenue; Western Auto Supply; auto supply store; 1st floor and basement; lease 1/1/65–12/31/66, with option for 2 more years. $450 per month rent, plus 3 percent of gross sales over $180,000 as additional rent.

(3) 441 Eastern Avenue; George Vlachos; barbershop; approximately 280 sq. ft.; lease 1/1/63–3/31/63. Automatically renewed for term unless either party cancels with 60 days' notice. $200 per month rent.

(4) 443 Eastern Avenue; Aetna Finance Co. of Essex, Inc.; small loan company; approximately 2,618 sq. ft.; lease 3/1/65–2/28/70. $300 per month rent. Tenant had right to cancel this lease at any time by giving 6-months' notice and paying 1-month's rent for each unexpired year of lease.

(5) 447 Eastern Avenue; Charles Bootery; shoe shop; approximately 2,500 sq. ft.; lease 6/1/65–5/31/67. $275 per month rent plus 7 percent of sales in excess of $47,142.80 as additional rent.

(6) 449 Eastern Avenue; Harry & Sadie Holtzman; jewelry store; approximately 2,200 sq. ft.; lease 4/1/63–4/30/65 and extended for 3 years from 5/1/65–4/30/68. $275 per month rent plus 6 percent over gross sales of $55,000 as additional rent.

(7) 451 Eastern Avenue; Norge Sales Corp.; laundromat; approximately 2,500 sq. ft.; Monthly tenant for storage of chattels and equipment. $300 per month rent.

(8) 2 South Taylor Avenue; Sherwin-Williams Co.; approximately 2,400 sq. ft.; lease 1/1/56–12/31/60. Tenant exercised option for renewal of lease for 5 years up to 12/31/65. $250 per month rent plus 3 percent of gross sales over $100,000 as additional rent.

*Parcel No. 2.*—501–515 Eastern Avenue (Block 1C, Lots 1–7 and 26–32). Lots 1–7 on the north side of Maryland Avenue between South Taylor and Margaret Avenues, were improved by a paved parking lot of approximately 50,000 square feet. Lots 26–32, along the south side of Eastern Avenue between South Taylor and Margaret Avenues, were improved on two levels by

brick and concrete buildings rebuilt in 1959, following a fire in 1957, with approximately 85,695 square feet of rentable space. Tenants of those properties and the terms of their occupancy were as follows:

(9) 501–515 Eastern Avenue; Ken's Cab Co.; cab stand for 2 cabs; lease 12/1/54–11/30/59; lessor could cancel with 30 days' written notice. $60 per month rent (originally $75, but reduced 11/62).

(10) 501 Eastern Avenue; Read Drug & Chemical; two floors approximately 8,200 sq. ft.; lease 1/1/64–12/31/68. Lease automatically renews for another 5 years unless tenant notifies 1 year in advance of intention not to renew. $600 per month rent plus 3 percent of net sales as additional rent.

(11) 503 Eastern Avenue (upper level) and 501–505 Eastern (lower level); Car Mor Co., Inc.; retail furniture store; approximately 10,500 sq. ft.; lease 3/1/63–2/28/68. $930 per month rent plus 4 percent over $400,000 gross sales as additional rent.

(12) 505 Eastern Avenue; Raymond's; men's clothing store; approximately 3,600 sq. ft.; lease from 15 days after completion to May 31, 1968. Rent started 12/1/60. $525 per month rent plus 5 percent of sales over $126,000 as additional rent.

(13) 507 Eastern Avenue; P & D Klein; women's clothes; approximately 3,600 sq. ft.; lease 2/1/62–1/31/68. Beginning 8/1/64 rent was reduced to $400 per month plus 5 percent on gross sales over $145,500 as additional rent.

(14) 507 Eastern Avenue; Baltimore County, Maryland Health Center; lower level; lease 7/1/62–5/31/69. $442.50 per month rent.

(15) 509 Eastern Avenue; A & P Tea Co.; grocery store; approximately 24,000 sq. ft.; lease 11/15/58–11/15/68. Option of tenant to extend lease for additional term of 10 years. Rent per month $2,500.

(16) 511 Eastern Avenue; Butler Bros.; 5 & 10 cents store; approximately 10,800 sq. ft.; lease 11/10/58–11/9/68. Option of tenant to renew for 10 more years. Rent per month $1,458.33 plus 4¾ percent of gross sales over $350,000.

(17) 513 Eastern Avenue; Calvert Rug; retail rug store; approximately 3,200 sq. ft.; lease 11/15/58–11/14/68. Rent $400 per month plus 3 percent of gross sales over $160,000.

(18) 515 Eastern Avenue; Maryland National Bank; bank; approximately 3,000 sq. ft.; lease 11/1/58–10/30/73. $1,133.33

per month rent. Option of tenant to extend lease for additional 10-year term at $15,000 per annum by giving 1 year's notice.

*Parcel No. 3.*—100 South Taylor Avenue; 435–437 Maryland Avenue (Block K, Lots 26–27, on the southwest corner of Maryland and South Taylor Avenues). These lots were improved by one-story brick buildings built in 1953, with approximately 9,681 square feet of rentable area. Tenants of those properties and the terms of their occupancy were as follows:

(19) 435 Maryland Avenue; Baltimore County People's Court; this and the next property total approximately 5,500 sq. ft.; lease 5/1/57–4/30/62 and extended to 4/30/67. $150 per month rent.

(20) 437 Maryland Avenue; Baltimore County Board of Library Trustees; county library; lease 7/1/62–6/30/67. Option of tenant to renew for 5 more years by giving 60 days' notice before expiration. $317.67 per month rent.

(21) 100 South Taylor Avenue; U.S. Post Office; approximately 4,181 sq. ft; lease 2/1/64–1/31/74. Option of tenant to renew lease for additional 5 years by giving notice on or before 10/31/73. $480 per month rent.

*Parcel No. 4.*—505 Maryland Avenue (Block 1B, Lots 1–6, on the southeast corner of the intersection of South Taylor and Maryland Avenues). These lots were improved by a paved parking lot of approximately 43,500 square feet.

Under the July 12, 1965, redemption agreement, E & T was to supervise, administer, and manage all of the real estate in which petitioner was a one-third holder for a period of 10 years under a separate management agreement. The substance of the management agreement was that petitioner would pay E & T 3 percent of his share of the gross rentals as a managing fee. E & T agreed to pay petitioner one-third of its annual net profits before depreciation and income taxes on the properties in which petitioner owned a one-third interest, but after amortization of the outstanding mortgage and such other capital charges due in connection with said portion. E & T had the exclusive right to enter into and/or renew leases on petitioner's real estate on such terms as it considered advisable. E & T further had full final right of decision as to retention or disposition, all financing or refinancing, repair or improvement, and such other management matters as arose. E & T agreed not to sell or mortgage said properties for less than fair value and that any funds received

were to be paid to petitioner unless he agreed in writing to allow such funds to remain in E & T.

The redemption agreement was conditioned upon obtaining a favorable ruling from the Internal Revenue Service as to the application of capital gains treatment to the distribution to petitioner in redemption of his stock. Such a ruling was obtained.

After receiving this favorable ruling, E & T's stockholders met on February 21, 1966, to elect the directors for the ensuing year. At that meeting the stockholders, petitioner, and his father, elected petitioner's father and mother, Howard Sweeten, and Helen Miller, as directors, whereupon petitioner ceased to be an officer, director, or employee of E & T.

On February 28, 1966, petitioner surrendered all of his E & T stock in exchange for a one-third undivided interest in E & T's real estate and other assets. The net fair market value of the distributed assets other than real estate, including cash, was $15,821.94.

During the period following the redemption until the end of August 1966, the properties owned jointly by E & T and petitioner were managed by someone other than petitioner. In June or July 1966, Sweeten, attorney for petitioner's father and an officer and director of E & T, became concerned about the declining health of petitioner's father. As a result, he approached petitioner about taking a contract from E & T for the management of the properties in order to avoid their deterioration.

On August 31, 1966, E & T's board of directors authorized its president, petitioner's father, to enter into a real estate management contract with J. O. Chertkof Co. This corporation was owned by petitioner and his family (wife and two sons) with petitioner owning 80 percent of the stock. Petitioner was president and the only family member active in the company. All dealings on the management contract were with petitioner. On the same date, the joint owners of the shopping center (petitioner and E & T) and J. O. Chertkof Co. executed the management agreement.

The management agreement gave the J. O. Chertkof Co. broad and exclusive management powers by providing as follows:

1. E & T hereby employs The Co. [J. O. Chertkof Co.] who accepts said employment to render the following services in connection with said properties;

(a) To hold said properties and others that might be added in the custody and control of The Co.;

(b) The Co. is to generally represent E & T in the management thereof;

(c) The Co. is to determine the tenancies and rates of rent they pay and to collect the rents and other income, if any, from the said properties and, quarterly, to distribute to E & T and JOC the net income to which each is entitled according to their respective interests, after reserving such amounts thereof as The Co. estimates to be proper for repairs, taxes, insurance and other expenses, including, but not limited to, decorating and painting, gas and electric bills, employment of and payment to janitors and watchmen;

(d) The Co. is to employ mechanics and contractors to make repairs to said properties as may be required from time to time, but to hold said repairs to what is considered to be a reasonable minimum in line with the present policy under which the properties are being operated, unless E & T otherwise directs;

(e) From the funds received as rents and other income, The Co. is authorized to pay taxes, insurance premiums and other similar and necessary operating fixed charges as they become due;

(f) The Co. is to keep accurate books of account on all transactions in respect to said properties and funds received, and shall render quarter-annual detailed statements;

(g) The Co. is to supply from time to time such information as it may possess for the purpose of having income and intangible tax returns prepared.

2. The Co. is to have the exclusive, but not transferable, management of all of said properties for the period of two (2) years from September 1, 1966, and annually thereafter, until this Agreement is terminated on an annual date subsequent to the date hereof, by either E & T or The Co. giving to the other party ninety (90) days written notice previous to the date on which termination is intended.

3. The Co. will have full authority to negotiate and procure all tenancies, and shall have full power to execute all leases on behalf of E & T during the term of this Agreement.

4. Whereas the prevailing fees for management services are: (a) 6% on the annual rentals collected; (b) 10% above maintenance, alterations and engineering costs; and (c) standard real estate brokerage commissions for new tenant rentals. Therefore, The Co. agrees that its compensation for the above three services shall be actual cost not to exceed 5% of the annual rentals. Costs shall not include any salaries, fees or compensation for Jack O. Chertkof, directly or indirectly. All real estate brokerage fees for leasing, if and when paid by The Co., shall be first approved by E & T and these amounts shall not be included in the cost of management services.

The J. O. Chertkof Co. never before nor since becoming a party to this management agreement managed property for any other client.

Petitioner made his own independent determination of the fair market value of the real estate assets distributed to him in

1966 in redemption of his E & T stock. His appraisal was not reduced to a written report. The above real estate interest was valued at $167,027.56 on petitioners' 1966 joint Federal income tax return. As of August 31, 1965, petitioner's one-third interest in E & T as reflected on the books and records of E & T was $167,027.56.

Petitioner treated the redemption in his 1966 return as a distribution in complete redemption of his E & T stock under section 302(b)(3) qualifying for capital gains treatment. The distribution was valued at $167,027.56. Following the redemption of his stock, petitioner was not an officer, director, or employee of E & T. He filed the agreement required by section 302(c)(2)(A)(iii) with his 1966 tax return. Respondent treated the distribution as an ordinary dividend valued at $348,258. At trial, respondent first changed his valuation to $309,000 and then later to $330,000.

## OPINION

We must first determine the fair market value of a February 28, 1966, E & T distribution to petitioner in exchange for his E & T stock. The parties have agreed that petitioner's share of nonrealty assets are valued at $15,821.94 and that his share of realty mortgage debt is $25,333.33. Consequently, to dispose of this issue we need only to determine the fair market value on February 28, 1966, of petitioner's undivided one-third interest in E & T's realty. Following this determination, the total distribution is valued by adding the realty and nonrealty asset values and subtracting the mortgage value.

Respondent issued a notice of deficiency in which he valued petitioner's interest in E & T's realty at $357,443.99. Petitioner valued the entire distribution at $167,027.56 in his 1966 joint Federal income tax return. At trial, and on brief, both parties modified their valuation figures. Respondent first contended the value of petitioner's real property interest was $309,000 and now contends the value is $330,000. Petitioner now contends the value is $200,000. We conclude that the February 28, 1966, fair market value of petitioner's undivided one-third interest in E & T's realty assets was $330,000.

Section 301(b)(1)(A) provides that the amount of a corporate distribution to a noncorporate shareholder in his capacity as such shall be the amount of money received plus the fair market

value of other property received on the date of distribution. Sec. 301(b)(3); sec. 1.301–1(b) and (c), Income Tax Regs. Fair market value is a question of fact. Sec. 1.1001–1(a), Income Tax Regs.

In determining the value of petitioner's undivided one-third interest in realty, we have made use of the entire record including the stipulation of facts made by the parties, all documentary evidence, the complete and detailed testimony of all witnesses, and the valuation report of respondent's expert witness.

In his determination of a fair market value of $357,443.99 in the notice of deficiency, respondent utilized the assessed value of the property according to Baltimore County records. Respondent subsequently utilized the services of one of its valuation experts to appraise the property.

Respondent's valuation expert, Leonard S. Rodwin, determined a value for petitioner's fractional real estate interest through a comparison of three accepted real estate valuation techniques—the cost, market, and income approach. Since petitioner's real property was income-producing and since there were no sales of comparable properties on or near the valuation date, Rodwin rejected the cost and market approaches as viable valuation techniques.

Rodwin's appraisal report concludes the income approach is the most accurate and finds a fair market value of $309,000 based upon that approach. He indicated the appraisal was based upon estimated rental income and expenses. At the trial, Rodwin computed a value of $330,000 by capitalizing the actual net income (unavailable to him at the time of his earlier appraisal) of the property for the fiscal years 1962 through 1966.

In developing a capitalization rate, Rodwin combined two elements—the interest rate and the recapture rate—to arrive at a figure of 11.3 percent.

Rodwin applied the capitalization rate under the building residual technique, an approach which removes from the net income an amount attributable to the land. Having determined the entire unencumbered value of the property to be $1,100,000 in round figures, Rodwin divided by 3 to reach petitioner's one-third interest at $366,667. To this figure, he allowed a 10-percent discount to recognize the effect on market value of a fractional real estate interest. This arrives at a value of $330,000.

Petitioner, on the other hand, presented no expert testimony

and no appraisal reports. Instead, he relied exclusively upon his own testimony that the value of the entire distribution was $200,000. His testimony as an obviously interested witness was vague and very general. He attempts to bolster the credibility of his testimony with reference to his many years of real estate activity, including oral appraisals for business acquaintances. Moreover, petitioner reported his distribution at a value of $167,027.56 on his 1966 Federal income tax return; a figure we note was more than coincidentally the precise recorded book value of petitioner's interest on E & T's books.

On the basis of the evidence in the record, we cannot help but conclude that the appraisal and testimony of respondent's expert constitutes the best evidence of the value of petitioner's one-third interest in E & T realty. Rodwin's utilization of the income approach is credible since there were no comparable sales and this was income-producing property. Moreover, we believe his capitalization rate, applied on the building residual technique, when accompanied by a discount for fractional interest is justified and reasonable. Moreover, his testimony was extremely direct, detailed, candid, honest, and believable.

On the other hand, petitioner, although an experienced real estate consulting engineer, is not a specialist at real estate appraising as is Rodwin. Even if he were, his testimony in this case was simply not detailed enough to support his asserted valuation. This is especially true when it is noted that he is an interested witness, he prepared no formal written appraisal report, and the value reflected on his return was the exact book value figure carried for his interest in E & T's books.

Accordingly, on the basis of the record before us, we find the unencumbered value of petitioner's one-third interest in E & T's realty assets to be $330,000. When the agreed mortgage debt of $25,333.33 is subtracted, and the agreed nonrealty assets of $15,821.94 are added to this figure, the fair market value of the total distribution on February 28, 1966, becomes $320,488.61.

Having determined the amount of the distribution to be $320,488.61, we must next decide whether the amount so distributed in redemption of petitioner's stock in E & T constituted a complete termination of his interest in the corporation within the meaning of section 302(b)(3).[3] The

---

[3]Petitioner argues in the alternative that the amount distributed qualifies under sec. 302(b)(1) as being "not essentially equivalent to a dividend." We cannot agree. By virtue of the stock ownership

resolution of this issue depends upon whether petitioner reacquired any interest in E & T (including an interest as officer, director, or employee) other than an interest as a creditor within the meaning of section 302(c)(2)(A)(i) and (ii).

Respondent asserts that petitioner reacquired such a prohibited interest under the August 31, 1966, management agreement. Petitioner simply asserts that whatever interest petitioner acquired under the management contract, it is not prohibited by section 302(c)(2)(A). We agree with respondent.

Section 302(a) provides that a distribution of property to a shareholder by a corporation in redemption of stock will be treated as a sale or exchange of the stock if the redemption falls into one of four categories enumerated in section 302(b). Under section 302(d), all redemptions which do not meet a specific statutory exception are treated as dividend distributions under section 301(c)(1), to the extent the corporation has earnings and profits.

Under section 302(b)(3), a shareholder is entitled to capital gains treatment if all the stock owned by that shareholder is redeemed. Section 302(c)(2) provides, in relevant part, that the attribution rules do not apply to a complete redemption of all the stock owned by the shareholder if immediately after the distribution "the distributee has no interest in the corporation (including an interest as officer, director, or employee) other

---

attribution rules of sec. 318(a)(1)(A)(ii), petitioner is considered the sole shareholder both before and after the distribution at issue. Under these circumstances, the Supreme Court stated in *United States v. Davis*, 397 U.S. 301, 308 (1970), that "such a redemption is always 'essentially equivalent to a dividend.'" *Sawelson v. Commissioner*, 61 T.C. 109 (1973).

Furthermore, we recognize that under certain limited circumstances, hostile family relationships have been held to block stock ownership attribution under sec. 318(a)(1) from one family member to another. *Robin Haft Trust v. Commissioner*, 510 F.2d 43, 47–48 (1st Cir. 1975), vacating and remanding 61 T.C. 398 (1973), supplemental opinion, 62 T.C. 145 (1974); *Benjamin v. Commissioner*, 66 T.C. 1084, 1107–1108 (1976); *Estate of Squier v. Commissioner*, 35 T.C. 950 (1961); *Parker v. Commissioner*, T.C. Memo. 1961–176. We disagree with petitioner, however, that his relationship with his father was so hostile as to prevent the attribution of his father's stock to him. Although petitioner testified that he and his father disagreed on policy matters relating to the management of the corporate rental properties, he also testified of his personal love, admiration, and respect for his father. Moreover, under the July 12, 1965, redemption agreement, petitioner and his father agreed that E & T was to supervise, administer, and manage all of the real estate in which petitioner was a one-third holder, for a period of 10 years under a separate management agreement. Finally, following petitioner's redemption, his father, as sole remaining actual shareholder, granted petitioner a broad management contract covering the same properties originally subject to the disagreement. Accordingly, we find petitioner failed the "not essentially equivalent to a dividend" test of sec. 302(b)(1).

than an interest as a creditor"; the distributee does not acquire any such interest within 10 years from the date of such distribution; and an appropriate agreement notifying the Secretary of any such acquisition is filed by the taxpayer. However, if the provisions of section 302(c)(2) are not met then the attribution rules of section 318 apply and petitioner is treated as the owner of his father's stock. Sec. 318(a)(1)(A)(ii).

Petitioner filed the required agreement with the Secretary and the parties agree that immediately after the distribution, petitioner did not remain an officer, director, or employee, or acquire any one of those interests within the prohibited period. Thus, the narrow issue is whether under the August 31, 1966, management agreement, petitioner acquired any interest in E & T "other than an interest as a creditor."

The resolution of this issue rests in part upon the application of *Estate of Lennard v. Commissioner*, 61 T.C. 554 (1974), to the facts of this case. Both parties contend the case supports their positions. We believe the facts in this case are distinquishable from those in *Estate of Lennard*. Therefore, we must hold for respondent.

In *Estate of Lennard*, the taxpayer's one-third interest in a close corporation in which his son also held a one-third interest was redeemed. Thereafter, the taxpayer continued to provide accounting services for the corporation. We found that, as an independent contractor, the taxpayer did not retain an interest in the corporation other than that of a creditor as provided by section 302(c)(2) on the basis that: (1) The accounting services performed were no more substantial than those which would have been performed by any other independent accountant; (2) the corporation could have discharged the taxpayer accountant at any time because there was no employment contract; and (3) there was no evidence that the accounting fee was keyed to the profits of the corporation.

Unlike in *Lennard*, the services petitioner performed as a result of entering the management agreement were not circumscribed but rather went to the essence of the purpose for E & T's existence. He had exclusive power on behalf of his corporation to negotiate, procure, and execute all leases on behalf of E & T. The agreement gave him the authority to collect rents, make necessary operating expenditures, keep accurate books and records, and distribute the net income to his own corporation as

well as to E & T. These powers over the only business asset of E & T in effect provided petitioner the wherewithal to control all of E & T's major policy decisions.

Furthermore, petitioner's power under the management agreement was anything but standard. There was substantial credible testimony that the scope of management services provided by the management agreement was much broader than those normally rendered in the customary management agreements in the Baltimore area during 1966. The absence of three major provisions made this agreement unusual. First, E & T had no obligation to pay the operating expenses if there was insufficient rental income to cover them. Second, E & T did not retain the power to discharge petitioner in the event he failed to act in accordance with the terms of the agreement except on the annual renewal date after the initial 2-year period expired. Third, there was no dollar limitation on repair and maintenance expenditures requiring E & T's prior approval.

By virtue of the management agreement, petitioner not only became an integral part of E & T in operating its business but also had more power than he had previously as a shareholder. Prior to the redemption, petitioner's father established the policy by which the corporation was operated and petitioner executed that policy. In fact, the redemption of petitioner's stock occurred because petitioner disagreed with his father's approach to managing the property. After having become party to the management agreement on behalf of his corporation, however, the power and authority petitioner acquired permitted him to formulate major policy decisions in managing E & T's property. Petitioner's exclusive power to negotiate leases was neither restricted nor required to be in accord with the operating policy his father had established prior to the redemption.

This case is also distinguishable from *Lennard* in that there was a written management contract in existence for 2 years which was automatically renewable for 1-year terms absent written notice 90 days before the end of an annual period. Therefore, the relationship between E & T and petitioner's corporation could not be terminated at any time.

Finally, petitioner also stood to gain financially as a result of his corporate management responsibilities under the management agreement. He was coowner of the property covered by the management agreement, with petitioner and E & T having a

one-third and two-thirds interest, respectively. Therefore, he had the power to affect his share of the rental income by controlling the granting of leases including the length of the leases, the clauses contained therein and, of most importance, the rent to be charged. Not only would petitioner's actions under the management agreement affect his one-third interest, but it would and did affect the property still owned by E & T. So, although petitioner's management fees were not keyed directly to the profits of E & T, his control over the profitability of the leases he negotiated did in effect give him a financial stake in E & T by providing him with the opportunity to realize more rental income from his one-third interest in the property he managed.

Since the success of E & T was directly dependent on petitioner's effort in managing E & T's property, we must find that he acquired a prohibited interest or an interest other than that of a creditor. In *Lewis v. Commissioner*, 47 T.C. 129, 137–138 (1966) (concurring opinion), it was noted that: "section 302(c)(2)(A)(i) * * * was concerned with a retained financial stake in the corporation, * * * or in the creation of an ostensible sale that really changed nothing so far as corporate management was concerned." Here, the management agreement executed 6 months after the redemption gave petitioner the power both to make corporate management policy decisions and to increase the rental income from his one-third interest in the property he managed. Accordingly, we hold that the distribution is taxable as an ordinary dividend.[4]

To reflect the foregoing,

*Decision will be entered for the respondent.*

---

[4]Since petitioners presented no evidence that there were not sufficient earnings and profits to support a dividend, they fail on the issue. Rule 142(a), Tax Court Rules of Practice and Procedure; *Makransky v. Commissioner*, 36 T.C. 446, 453 (1961), affd. 321 F.2d 598 (3d Cir. 1963).