# United States Tax Court

T.C. Memo. 2025-15

GREEN VALLEY INVESTORS, LLC, ET AL.,[1]
BOBBY A. BRANCH, TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————————

Docket Nos. 17379-19, 17380-19,　　　　Filed February 11, 2025.
17381-19, 17382-19.

————————

*Vivian D. Hoard, Adam R. Young, Kip D. Nelson, Richard A. Coughlin*, and *Elizabeth K. Blickley*, for petitioner.

*Jason P. Oppenheim, Alexandra E. Nicholaides, Steven Tillem*, and *Phillip A. Lipscomb*, for respondent.

## TABLE OF CONTENTS

MEMORANDUM FINDINGS OF FACT AND OPINION ..................... 3

FINDINGS OF FACT ........................................................................ 4

I.　Relevant History of Bobby Branch ................................................. 5

II.　The Subject Property and Ownership History ............................... 5

　　A.　Formation of Green Valley ...................................................... 6

　　B.　The Conservation Easement Transaction............................... 9

---

[1] The following cases are consolidated herewith: Vista Hill Investments, LLC, Bobby A. Branch, Tax Matters Partner, Docket No. 17380-19; Big Hill Partners, LLC, Bobby A. Branch, Tax Matters Partner, Docket No. 17381-19; and Tick Creek Holdings, LLC, Bobby A. Branch, Tax Matters Partner, Docket No. 17382-19.

[*2] C. 2014 and 2015 Tax Returns for Green Valley, Big Hill,
Tick Creek Holdings, and Vista Hill ..................................... 10

D. Relevant Portions of the IRS Audits of Green Valley,
Big Hill, Tick Creek Holdings, and Vista Hill ...................... 11

III. Testimony Presented at Trial ....................................... 13

A. The Property's Highest and Best Use ................................. 13

B. Value of the Property Before Granting of the
Conservation Easement ......................................................... 18

C. Value of the Property After Granting of the
Conservation Easement ......................................................... 20

OPINION .............................................................................. 21

I. Burden of Proof .................................................................. 21

II. Valuation of the Conservation Easement Donation ...................... 21

A. Valuation Principles ................................................. 21

B. The Property's Highest and Best Use ................................. 25

1. Whether the Proposed Development Was
Physically Possible and Legally Permissible ................. 25

2. Whether the Proposed Development Was
Financially Feasible and Maximally Productive ............ 25

C. Valuation of the Property Before the Easement .................... 29

1. Legal Framework ............................................. 29

2. Analysis ....................................................... 30

D. Value of the Property After the Easement ............................ 33

III. Penalties .................................................................. 33

A. Compliance with Section 6751(b) ......................................... 33

B. Section 6662 Accuracy-Related Penalties ............................. 36

[*3]    1.    The Gross Valuation Misstatement Penalty .................. 36

        2.    Substantial Understatement and Negligence
              Penalties ....................................................... 37

IV.  Conclusion.................................................................. 39

MEMORANDUM FINDINGS OF FACT AND OPINION

WEILER, *Judge*: These consolidated cases involve noncash charitable contribution deductions claimed for tax years 2014 and 2015 (years at issue). The partnerships in these consolidated cases are Green Valley Investors, LLC (Green Valley), Big Hill Partners, LLC (Big Hill), Tick Creek Holdings, LLC (Tick Creek Holdings), and Vista Hill Investments, LLC (Vista Hill and, collectively, Partnerships). By Notices of Final Partnership Administrative Adjustment (FPAAs), respondent disallowed charitable contribution deductions claimed on the Partnerships' Forms 1065, U.S. Return of Partnership Income, for the tax years at issue and totaling nearly $90 million. The Internal Revenue Service (IRS or respondent) disallowed the deductions claimed as follows:

|  | Tax Year Ending | Total Charitable Contribution Claimed | Total Charitable Contribution Disallowed | Total Charitable Contribution Allowed |
|---|---|---|---|---|
| Green Valley | 2014 | $22,559,000 | $22,559,000 | -0- |
| Big Hill | 2014 | 22,626,000 | 22,626,000 | -0- |
| Tick Creek Holdings | 2014 | 22,605,000 | 22,605,000 | -0- |
| Vista Hill | 2015 | 22,498,000 | 22,498,000 | -0- |

On May 27, 2021, we issued an Order granting respondent's Motion for Partial Summary Judgment in each of these consolidated cases. We determined the conservation easement deeds relating to the Partnerships fail to comply with Treasury Regulation § 1.170A-14(g)(6).[2]

_____

[2] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, regulation

[*4] Accordingly, we have determined that the Partnerships are not entitled to claim noncash charitable contribution deductions for the tax years at issue. Then, on November 9, 2022, by opinion, we set aside I.R.S. Notice 2017-10, 2017-4 I.R.B. 544, and granted petitioner's Cross-Motion for Summary Judgment prohibiting the imposition of section 6662A penalties in these consolidated cases. *See Green Valley Invs., LLC v. Commissioner*, 159 T.C. 80 (2022).

The parties entered into Stipulations to be Bound on October 3, 2023, whereby respondent, Big Hill, Tick Creek Holdings, and Vista Park mutually selected Green Valley as the test case for purposes of determining value of the conservation easement and reasonable cause defense to penalties. To determine the application of these penalties, we must determine the value of the charitable contribution claimed, which requires us to determine the fair market value (FMV) of the Green Valley conservation easement. The parties, additionally, have asked the Court to resolve the issue of penalty approval under section 6751(b) as to each of the four consolidated cases.

Trial was held, and after concessions, the issues for decision are (1) whether respondent has complied with section 6751(b) as to each penalty at issue in these cases; and (2) whether the gross valuation misstatement penalty, substantial understatement of income tax penalty, negligence penalty, and substantial valuation misstatement penalty apply to Green Valley for each of the years at issue.

FINDINGS OF FACT

Some of the facts are stipulated and are so found. The Stipulation of Facts and the attached Exhibits are incorporated herein by this reference.

The Partnerships are each treated as partnerships subject to the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71, for federal income tax purposes. Petitioner, Bobby A. Branch, is the tax matters partner for each of the Partnerships.[3] The Partnerships are each organized under

---

references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

[3] Before its repeal TEFRA governed the tax treatment and audit procedures for many partnerships, including Green Valley, Big Hill, Tick Creek Holdings, and Vista Hill.

[*5] North Carolina law as limited liability companies (LLCs) with principal places of business in Sanford, North Carolina.

## I.  *Relevant History of Bobby Branch*

Bobby Branch is from Sanford and has no formal education beyond the ninth grade. For some 30 years Mr. Branch has worked in real estate development. During his career he began acquiring real estate and developing land for open pit mining of metamorphic gneiss rock to be used as crushed stone construction aggregate. Around 2011 Mr. Branch acquired land for some $600,000. After performing geological exploration, developing a mine plan, and obtaining a mining permit, he sold the land to Martin Marietta[4] for $7.5 million. This sale by Mr. Branch to Martin Marietta also included a multiyear noncompete agreement.[5] Mr. Branch has previously obtained mining permits and has knowledge in the development of land for open pit aggregate mining.

## II.  *The Subject Property and Ownership History*

On February 1, 2011, Mr. Branch and his spouse, Elizabeth Branch, entered into an Offer to Purchase and Contract to buy 513.419 acres of land in Chatham County, North Carolina. Mr. Branch and his spouse acquired the land by warranty deed, dated April 16, 2011, which reflected consideration of ten dollars and other good and valuable consideration. The settlement statement from the act of sale indicates a contract sale price of $1,437,600.

On April 28, 2011, Mr. and Mrs. Branch then entered into an Agreement for Purchase and Sale of Real Property to acquire 93.713 acres of land in Chatham County. Mr. Branch and his spouse acquired that land by special warranty deed dated July 20, 2011, which merely reflected a sale for good and valuable consideration. The settlement statement from the act of sale indicates a contract sale price of $800,000.

Mr. and Mrs. Branch formed Bonlee Investment Properties, LLC (Bonlee), as a North Carolina LLC by filing articles of organization on July 20, 2012, with the North Carolina Department of the Secretary of

---

[4] Martin Marietta is a publicly traded corporation specializing in the sale of building materials including aggregate, cement, ready mix concrete, and asphalt with 500 locations and operations in 28 states in the United States as well as Canada, the Bahamas, and the Caribbean Islands.

[5] The scope of the noncompete agreement, including its geographical boundaries, is in dispute between the parties.

[*6] State. By General Warranty Deed, dated July 27, 2012, Mr. and Mrs. Branch conveyed 607.132 acres of land to Bonlee. The land consisted of the tracts acquired by Mr. and Mrs. Branch on April 16 and July 20, 2011.

On July 8, 2012, Joshua C. Patterson of Patterson Exploration Services issued a report to Mr. Branch entitled "Exploration and Evaluation of Aggregate Resources—'Green Valley Quarry'". In his executive summary Mr. Patterson indicated that he drilled eleven overburden holes and two diamond core holes at the property to test the quality and quantity of the rock at the site and to determine the property's average overburden depth. Mr. Patterson estimated that the proposed quarry had the capacity to produce over 20 million tons of marketable crushed stone construction aggregate with an annual production of 400,000 to 450,000 tons. Mr. Patterson also concluded that the aggregate rock which could be mined from the quarry should meet all North Carolina Department of Transportation (NCDOT) specifications. Lastly Mr. Patterson recommended that at least two additional diamond core holes be drilled in the initial pit area before opening.

Mark J. Zdunczyk issued a mineral valuation report for Bonlee on September 18, 2012. Mr. Zdunczyk concluded in his report that the pretax value of the crushed stone construction aggregate at the proposed Green Valley quarry was $6,662,680.

Martin H. Van Sant and Thomas F. Wingard of Van Sant-Wingard, LLC (Van Sant-Wingard), both signed a self-contained qualified appraisal report, dated December 31, 2013, wherein they concluded the 607 acres of land in Chatham County acquired by Mr. and Mrs. Branch, had an FMV of $22 million before the granting of any conservation easement over the land. In the appraisal Messrs. Van Sant and Wingard considered the property's highest and best use and after their analysis concluded an aggregate quarry mine was a financially feasible and maximally productive use of the property. Referring to Mr. Zdunczyk's report, Van Sant and Wingard used a discounted cashflow (DCF) approach to arrive at a net present rounded value of $22 million.

A.    *Formation of Green Valley*

In 2012 Mr. Patterson introduced Mr. Branch to Jeff Byers. Mr. Patterson had previously worked with Mr. Byers on conservation

[*7] easements in Georgia and thought Mr. Branch might be interested in the concept. Later in 2012 Mr. Branch retained James Freeman and Ricky Novak of Strategic Capital Partners because of their experience in raising capital for property development, including syndicated conservation easements.

On September 19, 2014, Green Valley was organized by M. Andrew Lucas as a North Carolina LLC. On November 24, 2014, after performing a land survey redividing the 607 acres into four parcels, Bonlee conveyed 141.65 acres to Green Valley. Mr. Branch and Bonlee were the initial members of Green Valley.

Mr. Branch, on behalf of Green Valley, retained Jerry McCalip, a geologist from McCalip & Co., Inc., to prepare a written report. In his report, dated December 16, 2014, Mr. McCalip provided an estimated value of the construction aggregate resource situated on the Green Valley property. He considered the Patterson Exploration Services report and determined a potential quarry would contain some 18,399,000 salable tons of construction aggregate, which would be sufficient to operate a quarry mine on the property for a minimum of 25 years. Mr. McCalip concluded the local market could support a production of 400,000 tons annually beginning in the fourth year of operation. Lastly, using a DCF model and assuming annual sales of 400,000 tons for 25 years, Mr. McCalip arrived at a range of potential values from $23.7 million to $15.5 million depending on the discount rate used. Ultimately, he concluded a value of $19,648,000, or $138,708 per acre, for the Green Valley property.

On behalf of Green Valley, Mr. Branch submitted an application, dated September 16, 2014, for a new mining permit for the Green Valley quarry with the North Carolina Department of Environment and Natural Resources. In this application Mr. Branch provided illustrations of a mine plan, which included the location of overburden and a plant site. He also indicated the maximum depth of the mine would be 300 feet, with an average depth of 150 feet.

Green Valley issued a private placement memorandum, dated December 15, 2014, which offered class A units for the sum of $50,000 per unit and sought to raise a total of $4.75 million. The memorandum included a summary of two potential business opportunities. One was the development of a mining operation on the Green Valley property; alternatively, the second was the promotion of conservation through the

[*8] granting of a conservation easement and the restriction of future land development.

The memorandum also included an Offering Summary and Case Study, which outlined a strategy for holding the Green Valley property for future appreciation, mining, or a conservation easement. The Offering Summary indicated the conservation easement would result in approximately $22,559,000 of federal and state charitable contribution deductions. The Offering Summary also offered an explanatory case study, which reads as follows:

> Significant opportunities exist to effectively mitigate one's federal and state taxes whether there is high ordinary income or long-term capital gain income, while at the same time being able to take part in conservation programs that create and preserve green space for future generations.
>
> **CASE STUDY:** In 2014, Taxpayer A, a Georgia married couple filing jointly, expects to have an AGI of $1.50 million and taxable income of $1.45 million. Taxpayer A pays a blended federal and state rate of 45%. Under the above scenario, unless a tax mitigation strategy is implemented, Taxpayer A will pay combined federal and state income taxes of $652,500 for 2014. Taxpayer A could offset up to $450,000 of income for federal and state tax purposes from conservation.
>
> In an effort to both mitigate tax liability and invest in real estate, Taxpayer A invests $100,000 in Green Valley Investors, LLC for 2 Class A Units. Green Valley Investors, LLC subsequently conserves the Property and generates tax benefits for each Member. Based on its membership interest, Taxpayer A will receive an estimated allocation via 2014 Form 1065 Schedule K-1 of approximately $437,645 in federal and state charitable contributions. As a result, income tax liability will be reduced from $652,500 to $455,560.
>
> In summary, Taxpayer A retains greater free cash, generates philanthropic goodwill from the conservation of natural resources, invests in real estate, and mitigates its overall effective tax rate and tax payments. Additionally, Taxpayer A owns a 1.94% equity interest in the Company.

[*9]     When compared to the cash outlay without investing, the conservation strategy saves Taxpayer A $96,940 in cash and projects to have additional returns going forward.

B.     *The Conservation Easement Transaction*

By December 29, 2014, 30 investors, including individuals and entities, had acquired 97% of the class A membership interests in Green Valley for the aggregate sum of $5 million. On December 29, 2014, Mr. Branch, as the Manager of Green Valley Investors, issued a Notice from the Manager of Green Valley Investors, LLC, with Response to Real Property (Notice). The Notice indicated that under the terms of the Green Valley Investors' operating agreement, Mr. Branch elected to pursue the conservation easement strategy as summarized in the memorandum and further outlined in an attachment to the Notice. The Notice also indicated that members could affirmatively reject this election by signing and returning the Notice before midnight on December 30, 2014.

As part of the Notice Mr. Branch executed an Action of the Manager and the Members of Green Valley Investors (Action), which had an effective date of December 30, 2014. Mr. Branch signed the consent to the Action both in his individual capacity and in his capacity as manager of Bonlee because he and Bonlee were class B members of Green Valley Investors.

The Action included a conservation strategy financial projection resulting in $21,882,230 in federal and state charitable contribution deductions to the class A members and $676,770 to the class B members. Lastly, the Notice included a restricted appraisal report signed by Mr. Van Sant, dated December 17, 2014, which reflected an FMV of $22,559,000 for this conservation easement.

On December 30, 2014, Besty Cook and Robert Howes of Triangle Land Conservancy (TLC) prepared a baseline documentation report of the Green Valley property. The report was issued to document the conditions of the Green Valley property at the time of the granting of the conservation easement and to assist in future monitoring of the easement property. According to the report the property was a former dairy farm with most of the property now used for agricultural purposes and consisting partially of woodland areas. The conservation easement would protect a portion of Tick Creek, which is on North Carolina's list of impaired or threatened waters since it includes a critical aquatic

**[*10]** system. The conservation plan permitted farming, forest management, and timber harvesting; however, the plan also required a buffer zone with a minimum width of 50 feet along Tick Creek and its tributaries that would restrict future timber harvesting and clearing of vegetation except for removing invasive species or removal of diseased trees.

Green Valley conveyed a conservation easement to TLC, a qualified organization under section 170(h)(1)(B), over approximately 136.12 acres of the Green Valley property via a deed of conservation easement. The deed is dated December 30, 2014, and was recorded on December 31, 2014, in Chatham County. Some 5 acres of land on the Green Valley property were retained and were not part of the conservation easement deed; instead, the land was reserved for construction of a future single-family residence on 1.5 acres of land (home site). The deed listed three permitted uses for the property, including forest management, agricultural and horticultural use, and recreational use, including the use of motorized vehicles. Among other use limitations on the property, the construction of buildings and other structures was prohibited except for new improvements constructed on the reserved home site.

Pursuant to a separate acknowledgment letter dated March 31, 2015, TLC's Interim Executive Director acknowledged receipt of the conservation easement donations made by Green Valley. On December 31, 2014, Bryan Cave, LLP, issued separate tax opinions to Green Valley, Big Hill, and Tick Creek Holdings. On December 3, 2015, Mr. Cave issued a tax opinion to Vista Hill.

C.     *2014 and 2015 Tax Returns for Green Valley, Big Hill, Tick Creek Holdings, and Vista Hill*

Green Valley timely filed its 2014 Form 1065 and claimed a charitable contribution deduction of $22,559,000. Attached to Green Valley's Form 1065 were Form 8283, Noncash Charitable Contributions, a written acknowledgment by the donee, and an appraisal from Van Sant-Wingard. Form 8283 was also signed by Messrs. Wingard and Van Sant and included, among other information, a description of the property subject to a conservation easement, a summary of the property's physical condition, and Green Valley's cost basis in the property.

[*11]  Big Hill timely filed its 2014 Form 1065 and claimed a charitable contribution deduction of $22,626,000. Attached to Big Hill's Form 1065 were Form 8283, a written acknowledgment by the donee, and an appraisal from Van Sant-Wingard. Form 8283 was also signed by Messrs. Wingard and Van Sant and included, among other information, a description of the property subject to a conservation easement, a summary of the property's physical condition, and Big Hill's cost basis in the property.

Tick Creek Holdings timely filed its 2014 Form 1065 and claimed a charitable contribution deduction of $22,605,000. Attached to Tick Creek Holdings' Form 1065 were Form 8283, a written acknowledgment by the donee, and an appraisal from Van Sant-Wingard. Form 8283 was also signed by Messrs Wingard and Van Sant and included, among other information, a description of the property subject to a conservation easement, a summary of the property's physical condition, and Tick Creek Holdings' cost basis in the property.

Vista Hill timely filed its 2015 Form 1065 and claimed a charitable contribution deduction of $22,498,000. Attached to Vista Hill's Form 1065 were Form 8283, a written acknowledgment by the donee, and an appraisal from Van Sant-Wingard. Form 8283 was also signed by Messrs. Wingard and Van Sant and included, among other information, a description of the property subject to a conservation easement, a summary of the property's physical condition, and Vista Hill's cost basis in the property.

D.  *Relevant Portions of the IRS Audits of Green Valley, Big Hill, Tick Creek Holdings, and Vista Hill*

Beginning in April 2016 Revenue Agent Joy A. Bradley was assigned to the IRS examinations of Green Valley's, Big Hill's, and Tick Creek Holdings' 2014 returns and Vista Hill's 2015 return. Roy Nixon, a penalty specialist with the IRS, was assigned to assist Ms. Bradley with these IRS examinations. After consulting with Mr. Nixon, Ms. Bradley sought supervisory approval for the assertion of penalties by the IRS against the Partnerships.

Ms. Bradley prepared Forms 5701, Notice of Proposed Adjustment, Forms 886–A, Explanation of Items, and Penalty Lead Sheets in the IRS examinations of Green Valley, Big Hill, Tick Creek Holdings, and Vista Hill. She emailed these Forms to her manager, Charles Phillip, on April 4, 2017. This email included Penalty Lead

[*12] Sheets seeking Mr. Phillip's approval to assert section 6662(c), (d), and (e) penalties against Green Valley, Big Hill, Tick Creek Holdings, and Vista Hill. The packet also included Forms 5701 and Forms 886–A, which asserted section 6662(c), (d), (e), and (h) penalties against Green Valley, Big Hill, Tick Creek Holdings, and Vista Hill. On April 4, 2017, Mr. Phillip placed his digital signature on each of the IRS Forms 5701 and the Penalty Lead Sheets, and then he returned the signed documents to Ms. Bradley by email. On April 19, 2017, Mr. Phillip digitally signed Letters 1807 in the IRS examinations of Green Valley, Big Hill, Tick Creek Holdings, and Vista Hill. Ms. Bradley included Mr. Phillip's signed Letters 1807 when she transmitted Forms 5701, Forms 886–A, and Penalty Lead Sheets to petitioner.

On May 19, 2017, Ms. Bradley sent Mr. Phillip revised Penalty Lead Sheets, now seeking approval to assert section 6662(c), (d), (e), and (h) penalties against Green Valley, Big Hill, Tick Creek Holdings, and Vista Hill. On this same date, Mr. Phillip placed his digital signature on each of the revised Penalty Lead Sheets and returned them to her by email. On June 5, 2017, Ms. Bradley shipped the examination files to Mr. Phillip. Upon shipping the files, she emailed Mr. Phillip asking him to manually sign the Penalty Lead Sheets. On June 12, 2017, Mr. Phillip physically signed the Penalty Lead Sheets he had previously digitally signed on May 19, 2017.

On September 19, October 2, and November 13, 2017,[6] respondent issued 60-day letters to Big Hill, Vista Hill, Tick Creek Holdings, and Green Valley, respectively. In response to these 60-day letters, petitioner sought an administrative appeal to the IRS Independent Office of Appeals (Appeals).

On October 16, 2018, Appeals Officer (AO) Jackie Berry conducted an Appeals preconference meeting. Present at this two-hour meeting were some 13 people, including employees of Appeals, several IRS employees, and representatives of petitioner. AO Berry memorialized the meeting by preparing a preconference memorandum to Appeals Team Manager Clarence Phillips. In this memorandum to Mr. Phillips, AO Berry writes as follows:

> Taxpayer representative Greg[ory] Rhodes asked if the
> penalty was approved by the LB&I manger. The manager,

---

[6] Both the Green Valley and Tick Creek 60-day letters were issued on this same date.

**[\*13]** Charles Phillip, confirmed that he approved the penalty. Greg asked who determined that the penalty should be assessed. Charles said that he did. [IRS Counsel] Kim[berly] Tyson interjected that the revenue agent Joy Bradley proposed the penalty and Charles just approved it. She noted that the [taxpayer] representatives filed a [Freedom of Information Act request] so they know that. Greg said for Kim to let Charles answer the question. Kim said the representatives are trying to establish a section 6751(b) issue during their pre-conference and that isn't fair. [AO Berry] stated that his understanding is that the team manager signed off his approval of the penalty after it was proposed by the revenue agent.

III.  *Testimony Presented at Trial*

At trial the parties offered mostly expert witness testimony regarding the Green Valley property's hypothetical legally permissible use as a crushed stone aggregate quarry on the basis of conceptual design plans, the property's access to nearby utilities, and a financial feasibility study. Below we will discuss this evidence presented, considering the Green Valley property's highest and best use, and its FMVs both before and after the granting of the conservation easement on December 31, 2014.

A.  *The Property's Highest and Best Use*

Petitioner offered expert witness testimony from Alan Shapiro, a geologist with Geological Consulting Services, Inc. Mr. Shapiro was accepted by the Court as an expert in exploration geology, construction aggregates, and the geology of the Southern Appalachian Mountain region. Mr. Shapiro reviewed the previous geological information from the diamond core testing performed by Patterson Exploration Services as well as 2017 core testing. He concluded that an indicated resource was present at the Green Valley property and that the tested samples from 2012 and 2017 all passed NCDOT specifications.

Petitioner offered expert witness testimony from Steven Reynolds of Reynolds Consulting. Mr. Reynolds was accepted by the Court as an expert in the marketing and sales of construction aggregates. He explained the manufacturing process of construction aggregate, which includes the crushing of rock and subsequent sorting into different sizing, known as screening. He offered a flowsheet as follows:

**[*14]**



After considering competitors, market share, and transportation of aggregate, he opined that a potential quarry at the Green Valley property would achieve sales of 500,000 tons of aggregate annually. He indicated that customers of Green Valley would include ready mix concrete plants and asphalt plants and could achieve sales equating to approximately 5% of total market share without any degradation of price.

Petitioner offered testimony from Mr. Meister, an engineer and president of MeisteRox, LLC. He was accepted as an expert in mining, mineral processing, and the establishment of mineral resources and reserves. Mr. Meister performed a retrospective preliminary feasibility study and concluded that it was legally permissible, physically possible, and economically viable to develop the Green Valley property into a construction aggregate quarry mine. Citing the market study performed by Mr. Reynolds, Mr. Meister concluded that this market study was well supported, that the Green Valley property could conservatively achieve sales of 500,000 tons per year within a radius of 45 miles, and that the property could possibly have market reach beyond 45 miles because of low fuel rates in 2014. Mr. Meister performed a DCF analysis and concluded that the mineral resources on the property resulted in a net present value of $23.9 million.

[*15]  Next, petitioner offered expert witness testimony from James M. Griffin, a mining industry executive and president of Griffin Mining Advisors, LLC. He was accepted as an expert in natural resources, project development, mine finance, and mergers and acquisitions. Mr. Griffin performed a risk assessment in the mining project process from exploration to production. After considering several risks—including resource and reserve risk, production risk, and market risk—he concluded that the hypothetical quarry at the Green Valley property had been adequately de-risked, the cashflow projections reflected sound engineering, and commercial principles were appropriately discounted. He opined that the Shapiro, Davis, Meister, and Reynolds reports, which include cashflow projections and geological engineering, could be used for third-party financing purposes.

Petitioner offered expert witness testimony from Michael F. Wick, an engineer and vice president with John T. Boyd Co. Mr. Wick was accepted by the Court as an expert in mining engineering. He performed an independent assessment of the aggregate/crushed stone industry and opined on an appropriate pretax weighted average cost of capital for a potential quarry site such as the Green Valley property. He concluded that the most appropriate pretax weighted average cost of capital was 14% with a reasonable range being between 13% and 15%. Petitioner also offered testimony from Tracy Davis, P.E., owner/president of ATS Environmental Solutions, PLLC. Mr. Davis was accepted as an expert in mine permitting in North Carolina. He had previously worked for the North Carolina Department of Environmental Quality, Division of Energy, Mineral and Land Resources. He issued a report at the request of Green Valley. In his report he opined that it was highly likely the Green Valley mining permit application would have been approved if it had continued the permit application process with the State of North Carolina. Mr. Davis, however, also acknowledged that Green Valley withdrew its mining permit application with the state and that it never submitted the requested additional information.

In rebuttal, respondent offered testimony from Martin Messmer, a geologist with the U.S. Department of Interior, Division of Minerals Evaluation, Appraisal and Valuation Services Office. Mr. Messmer was accepted by the Court as an expert in geology, mineral evaluations and valuations, and mineral market analysis. Mr. Messmer visited local quarries and spoke to market participants regarding local market demand for crushed stone construction aggregate. He found that there would be abundant competition in both local and regional markets should a hypothetical construction aggregate quarry open at the Green

[*16] Valley property and that the quarry would be in a rural setting with the nearest markets over 30 miles in traveling distance. He opined that while a quarry at the Green Valley property was physically possible, given the location of the quarry it would face a significant cost barrier to market entry because of high transportation costs to reach urban and suburban markets as well as competition from other established competing quarries.

In rebuttal, respondent also offered testimony from Ryan Z. Taylor, a geologist and program lead with the U.S. Department of Interior, Division of Minerals Evaluation. Mr. Taylor was accepted by the Court as an expert in geology, mineral evaluation review, mineral valuations, and mineral market analysis. Mr. Taylor reviewed Mr. Meister's preliminary feasibility study and testified he found significant errors and omissions which called into question the results of Mr. Meister's conclusions. He opined that Mr. Meister's conclusions went beyond the Society for Mining, Metallurgy & Exploration's (SME) mining guidelines and improperly relied on Mr. Reynolds's flawed market study to determine a potential market share of annual aggregate sold as well as pricing of aggregate.

Citing the figure below from the 2014 SME guide, Mr. Taylor discussed the relationship between data confidence and the various classifications of mineral resources and reserves.

**[*17]** **Figure 1. General relationship between Exploration Results, Mineral Resources and Mineral Reserves**



Mr. Taylor concluded that, on the basis of these foregoing standards, it was not possible for Mr. Meister, using data only available in 2014, to convert an "indicated" or "measured" resource into a mineral reserve.

In his market analysis Mr. Taylor reviewed the market study by Mr. Reynolds and explained that, after considering transportation and pricing factors, the conclusion that a hypothetical quarry mine at the Green Valley property would achieve sales equal to 5% of market share was not well supported.

In further rebuttal, respondent offered testimony from Erik Ronald, a geologist with SRK Consulting (U.S.), Inc. He was recognized as an expert in geology and mineral resource evaluation. Mr. Ronald opined that the rock on the Green Valley property was ubiquitous in nature and similarly existed in central North Carolina. After his review of the Patterson report, his own independent analysis, and a site visit, he concluded the rock material that could be sourced from the Green Valley property was of sufficient quality to meet NCDOT standards as construction aggregate. However, it was Mr. Ronald's opinion that the technical work performed by Patterson Exploration Services did not represent good industry standards, nor did it adhere to SME guidelines in declaring a mineral reserve.

[*18]  B.  *Value of the Property Before Granting of the Conservation Easement*

Petitioner offered expert witness testimony from James C. Clanton, a member of the Appraisal Institute (MAI) and an appraiser with MVC Consulting, Inc. Mr. Clanton was accepted as an expert in appraisal and real estate valuation. He performed an appraisal and issued a report to determine the fee simple real property interest as of December 30, 2014, before the conservation easement was granted on the Green Valley property. In his report he made four extraordinary assumptions including that mining permits for the property would be obtained, the proposed mine plan by Royal CAD Design was physically possible, and the reports by Geological Consulting and Mr. Reynolds were correct.

In determining his opinion of value for the Green Valley property Mr. Clanton used the income approach to value, and more specifically, he performed a DCF analysis to arrive at a net present value of a hypothetical mining operation as of December 30, 2014, of $15,900,000. When calculating his DCF for a hypothetical quarry on the property Mr. Clanton used a production amount ranging from 200,000 tons sold in year 2 to 661,752 tons in year 20 at prices ranging between $18.96 per ton in year 2 and $29.58 per ton in year 20, resulting in a negative cashflow through year 2 but net annual income thereafter between $518,395 and $1.8 million and a net present value of future cashflows of more than $15 million.

In rebuttal, respondent offered expert witness testimony from Charles Brigden, MAI, an appraiser and managing director with JLL Valuation & Advisory Services, LLC (JLL). He was accepted as an expert in real estate appraisal, appraisal of conservation easements using the before and after methodology, and appraisal of vacant land. Mr. Brigden performed an appraisal and issued a report to determine the fee simple real property interest before the conservation easement placed on the Green Valley property as of December 30, 2014. As part of his market study Mr. Brigden examined sales transactions of raw land. First, he considered all available land sales of at least 50 acres in Chatham County from 2010 to 2022. Next, he considered land sales of at least 50 acres in Chatham County between 2012 and 2015; he further examined this particular subset of sales because they occurred closer in time to the granting of the conservation easement. Finally, he noted two land sales that occurred in Chatham County where the intent to mine

**[*19]** or quarry construction aggregate was present during the sale. In those cases, the land sold for $10,000 and $11,016 per acre, respectively.

Mr. Brigden concluded the highest and best use of the property before the granting of the easement was low-density residential use in combination with agricultural and recreational use. On the basis of his market analysis and using the sales comparison approach to value, he concluded that no premium would be paid for the Green Valley property, even assuming there were known minerals on the site and the opportunity to seek a permit to allow mining at the site. Finally, he noted that a "greenfield" site currently operating as the Daurity Springs quarry was acquired in January 2013 for $10,000 per acre, and a mining permit was subsequently granted by North Carolina in October 2014. Ultimately, Mr. Brigden determined a before easement FMV of $4,800 per acre or $680,000 in total for the Green Valley property using the sales comparison approach to value.

In rebuttal, respondent offered expert witness testimony from Thomas Hamilton, Ph.D., MAI, an appraiser with JLL. He was accepted as an expert in real estate valuation, appraisal theory, valuation practice, real estate market practice, appraisal education, and real estate quantitative analysis. Dr. Hamilton performed an appraisal and issued a report for the purpose of determining a use value of the Green Valley property. To determine a use value he identified 81 surface-mining-related land sale transactions in North Carolina. Of these 81 sale transactions 31 occurred before January 1, 2016. Six of those transactions were for land with mining permits at the time of the transaction; nine transactions were for unpermitted land. Of these nine transactions Dr. Hamilton identified five transactions as having the same potential future quarry mining use; those five sales ranged from $11,016 to $3,382 per acre. These transactions occurred between January 31, 2013, and December 15, 2015. Assuming a hypothetical future use for the Green Valley property as a construction aggregate mine and using the sales comparison approach to value, he concluded that the property had a use value of $9,200 per acre and a total rounded value of $1.25 million as of December 31, 2014.

Petitioner offered testimony from Ted Whitmer, MAI. Mr. Whitmer was accepted as an expert in appraisal theory, methodology, standards, and ethics. Mr. Whitmer did not perform an appraisal of the Green Valley property; however, he reviewed the appraisal reports prepared by Messrs. Brigden and Hamilton. Mr. Whitmer opined that Mr. Brigden's report is not helpful in

[*20] determining the FMV of the Green Valley property if the property's highest and best use is mining. He further opined that the methodologies used in Mr. Brigden's report merely ignored specific characteristics of the Green Valley property as a mining property. In his critique of both Messrs. Brigden and Hamilton, Mr. Whitmer found their reports to negate each other and to "ignore the stage of knowledge of minerals on the subject property." He also concluded that Mr. Hamilton's use value appraisal was contrary to the task at hand since use value may or may not be equal to market value and use value is a concept different from FMV. In sum, he opined that the Court should reject Messrs. Brigden's and Hamilton's conclusions as to the FMV of the Green Valley property.

In rebuttal, respondent offered expert witness testimony from Nicholas D. Pilz, MAI, a partner with EDGE Realty Advisors, LLC, and owner of Pilz Consulting Services, Inc. He was recognized as an expert in appraisal theory, appraiser ethics, *Uniform Standards of Professional Appraisal Practice* (USPAP), and USPAP education. Mr. Pilz reviewed the appraisal performed by Mr. Clanton and found that the appraisal did not match the scope of work performed and that Mr. Clanton's appraisal was not in compliance with USPAP, including Standards 1 and 2, which caused the appraisal's conclusions to be misleading and not credible.

C.    *Value of the Property After Granting of the Conservation Easement*

To determine his opinion of value for the Green Valley property after the granting of the easement, Mr. Clanton used the sales comparison approach. He selected five properties as comparable, all being encumbered with conservation easements, ranging in size from 62.6 acres to 407.84 acres, and located in North Carolina, South Carolina, or Georgia. Mr. Clanton arrived at an average price per acre of $1,800 on the basis of his comparable properties and a rounded value of $250,000 for the property. Mr. Brigden also determined an after easement FMV for the Green Valley property. He concluded that the highest and best use of the Green Valley property after easement was agricultural and recreational use, and he determined an FMV of $2,000 per acre or $280,000 in total, again using the sales comparison approach to value.

**[\*21]**                                    OPINION

I.      *Burden of Proof*

Ordinarily, the taxpayer bears the burden of proving that the Commissioner's determinations are erroneous.[7] Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). That burden includes proving entitlement to any deductions claimed. *See INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934). Petitioner therefore generally bears the burden of proving the Partnerships' entitlement to the charitable contribution deductions for qualified conservation contributions under the applicable provisions of section 170, as well as the burden of proving the value of the conservation easement.

II.     *Valuation of the Conservation Easement Donation*

A.      *Valuation Principles*

Generally, the amount of a charitable contribution deduction under section 170(a) for a donation of property is the FMV of the property at the time of the donation. Treas. Reg. § 1.170A-1(c)(1). Treasury Regulation § 1.170A-1(c)(2) defines FMV to be "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." With respect to valuing a donation of a partial interest in property Treasury Regulation § 1.170A-7(c) provides that "[e]xcept as provided in § 1.170A-14, the amount of the deduction under section 170 . . . is the [FMV] of the partial interest at the time of the contribution." Treasury Regulation § 1.170A-14(h)(3)(i) in turn sets forth the following method for valuing a perpetual conservation restriction:

> If there is a substantial record of sales of easements comparable to the donated easement (such as purchases pursuant to a governmental program), the [FMV] of the donated easement is based on the sales prices of such

---

[7] As to the burden of production section 7491(c) provides that the Commissioner "shall have the burden of production in any court proceeding with respect to the liability of any individual for any penalty, addition to tax, or additional amount." However, section 7491(c) does not apply to TEFRA partnership-level proceedings, such as these cases. *See Dynamo Holdings Ltd. P'ship v. Commissioner*, 150 T.C. 224, 234 (2018). Therefore, petitioner bears not only the burden of proof but also the burden of production even as to any penalty.

[*22] comparable easements. If no substantial record of market-place sales is available to use as a meaningful or valid comparison, as a general rule (but not necessarily in all cases) the [FMV] of a perpetual conservation restriction is equal to the difference between the [FMV] of the property it encumbers before the granting of the restriction and the [FMV] of the encumbered property after the granting of the restriction. The amount of the deduction in the case of a charitable contribution of a perpetual conservation restriction covering a portion of the contiguous property owned by a donor and the donor's family . . . is the difference between the [FMV] of the entire contiguous parcel of property before and after the granting of the restriction.

The FMV of property on a given date is a question of fact to be resolved on the basis of the entire record. *McGuire v. Commissioner*, 44 T.C. 801, 806–07 (1965); *Kaplan v. Commissioner*, 43 T.C. 663, 665 (1965). In these cases we do not have "a substantial record of sales of easements comparable to the donated easement," and we will therefore base our valuation on the before and after method. *See* Treas. Reg. § 1.170A-14(h)(3)(i). Treasury Regulation § 1.170A-14(h)(3)(ii) provides:

If before and after valuation is used, the [FMV] of the property before contribution of the conservation restriction must take into account not only the current use of the property but also an objective assessment of how immediate or remote the likelihood is that the property, absent the restriction, would in fact be developed, as well as any effect from zoning, conservation, or historic preservation laws that already restrict the property's potential highest and best use.

Where a landowner posits that a different use is "highest and best," he must show that this use is "reasonably probable" and that the probability has a real market value. *United States v. 69.1 Acres of Land*, 942 F.2d 290, 292 (4th Cir. 1991) (quoting *Olson v. United States*, 292 U.S. 246, 257 (1934)); *see Brooks v. Commissioner*, 109 F.4th 205, 219 (4th Cir. 2024), *aff'g* T.C. Memo. 2022-122. "Where a proffered highest and best use is extraction of some sort of mineral, the landowner must show not only the presence of the mineral in commercially exploitable amounts, but also that a market exists for the mineral that would justify its extraction in the reasonably foreseeable future." *69.1 Acres of Land*,

**[\*23]** 942 F.2d at 292 (citing *United States v. Whitehurst*, 337 F.2d 765, 771–72 (4th Cir. 1964)); *St. Genevieve Gas Co. v. TVA*, 747 F.2d 1411, 1413 n.4 (11th Cir. 1984).[8]

In looking to the U.S. Court of Appeals for the Fourth Circuit,[9] we find longstanding general valuation principles to be informative here. *See United States v. Carroll*, 304 F.2d 300, 306 (4th Cir. 1962). First, it is improper to evaluate property by appraising it for several different uses; second, "the most profitable use to which the land can reasonably be put in the reasonably near future may be shown and considered as bearing upon the market value"; and third, in arriving at market value, we should take into account all considerations that might fairly be brought forward and given substantial weight in bargaining between a willing buyer and seller. *Id.*

The two methods generally used to determine the before easement FMV and the after easement FMV are the comparable sales and income methods. The comparable sales method looks at arm's-length transactions that involve properties similar to the subject property and sold within a reasonable time of the valuation date. *See, e.g.*, *Wolfsen Land & Cattle Co. v. Commissioner*, 72 T.C. 1, 19 (1979); *Butler v. Commissioner*, T.C. Memo. 2012-72, slip op. at 38. The income approach projects the future cashflows the property will generate at its highest and best use. *See, e.g.*, *Butler*, T.C. Memo. 2012-72, slip op. at 39; *Trout Ranch, LLC v. Commissioner*, T.C. Memo. 2010-283, slip op. at 9–10, *aff'd*, 493 F. App'x 944 (10th Cir. 2012). This method assumes that an investor would pay no more than the present value of the property's anticipated future income. *Butler*, T.C. Memo. 2012-72, slip op. at 39.

In the case of vacant, unimproved property, the market approach—often called the "comparable sales" or "sales comparison" method—is "generally the most reliable method of valuation." *Estate of Spruill v. Commissioner*, 88 T.C. 1197, 1229 n.24 (1987) (quoting *Estate of Rabe v. Commissioner*, T.C. Memo. 1975-26, 34 T.C.M. (CCH) 117,

---

[8] When the parties propose different uses for the property, we are to consider whether there is "too high a chance that the property will not achieve the proposed use in the near future," causing the use to be too risky to qualify. *TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th 1354, 1369 (11th Cir. 2021) (quoting *Palmer Ranch Holdings Ltd. v. Commissioner*, 812 F.3d 982, 1000 (11th Cir. 2016), *aff'g in part, rev'g and remanding in part* T.C. Memo. 2014-79). Then, after determining a property's highest and best use, our task is to arrive at a value on the basis of that use. *Id.* at 1370.

[9] The court to which an appeal would presumably lie. *See* I.R.C. § 7482(b)(1)(E).

**[\*24]** 119, *aff'd*, 566 F.2d 1183 (9th Cir. 1977) (unpublished table decision)). Because no two properties are ever identical, the appraiser must make adjustments to account for differences between the properties (e.g., parcel size and location) and terms of the comparable sales (e.g., proximity to valuation date and conditions of sale). *See Wolfsen Land & Cattle Co.*, 72 T.C. at 19. The accuracy of an appraiser's valuation "depends to a great extent upon the comparables selected and the reasonableness of the adjustments made." *Id.* at 19–20.

To show the value of the conservation easement, including the highest and best use before and after the donation of the property, the parties have offered the reports and testimony of expert witnesses. *See* Rule 143(g). "Opinion testimony of an expert is admissible if and because it will assist the trier of fact to understand evidence that will determine a fact in issue," and we evaluate expert opinions "in light of the demonstrated qualifications of the expert and all other evidence of value." *Parker v. Commissioner*, 86 T.C. 547, 561 (1986) (first citing Fed. R. Evid. 702; then citing *Estate of Christ v. Commissioner*, 480 F.2d 171, 174 (9th Cir. 1973), *aff'g* 54 T.C. 493 (1970); and then citing *Anderson v. Commissioner*, 250 F.2d 242, 249 (5th Cir. 1957), *aff'g in part and remanding* T.C. Memo. 1956-178). Where experts offer competing estimates of FMV, we decide how to weight those estimates by, among other things, examining the factors they considered in reaching their conclusions. *See Casey v. Commissioner*, 38 T.C. 357, 381 (1962). We are not bound by the opinion of any expert witness, and we may accept or reject expert testimony in the exercise of our sound judgment. *Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 294–95 (1938); *Estate of Newhouse v. Commissioner*, 94 T.C. 193, 217 (1990). We may also reach a decision as to the value of property that is based on our own examination of the evidence in the record. *See Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir. 1976), *aff'g* T.C. Memo. 1974-285.

Petitioner, citing decisions of this Court, contends the income approach is commonly used to determine the FMV of property that has potential for producing income.[10] While the general statement remains true, we have also found that in the case of raw unimproved land, the market approach—otherwise known as the comparable sales method—is generally the most reliable method. *See Whitehurst*, 337 F.2d at 775.

---

[10] Petitioner cites *Estate of Cecil v. Commissioner*, T.C. Memo. 2023-24, *Estate of Morrissette v. Commissioner*, T.C. Memo. 2021-60, and *Estate of Jones v. Commissioner*, T.C. Memo. 2019-101, for this statement. While generally true, the conclusions reached in those cases are taken out of context by petitioner.

**[*25]** *See generally Excelsior Aggregates, LLC v. Commissioner*, T.C. Memo. 2024-60, at *33.

We find the question of income approach versus sales comparison approach is largely predicated upon our determination of the property's highest and best use. In other words, our conclusion as to the property's highest and best use and whether the property is income producing (hypothetically or not) will lead to a more informed conclusion as to whether the income approach or a different approach to value is most appropriate.[11]

With these principles in mind, we will now explain the basis of our valuation of the conservation easements, i.e., the value of the Green Valley property.

B.   *The Property's Highest and Best Use*

1.   *Whether the Proposed Development Was Physically Possible and Legally Permissible*

There appears to be no genuine dispute that an aggregate mine at the Green Valley property is physically and legally possible. The parties agree that construction aggregate of sufficient quality exists on this property and that rezoning the property was a strong possibility. Accordingly, we will accept that a construction aggregate mine at the Green Valley property is a physical and legal possibility.

2.   *Whether the Proposed Development Was Financially Feasible and Maximally Productive*

In support of their respective positions on the value of the conservation easement, the parties presented evidence relating mostly to expert witness testimony. To determine whether the Green Valley

---

[11] We are not hostile to the income approach to determining value, and we have accepted (and applied) it in determining the value of conservation easements, *see, e.g.*, *Symington v. Commissioner*, 87 T.C. 892 (1986) (subdivision method), although it is not favored if comparable sales data are available, *see, e.g.*, *Chertkof v. Commissioner,* 72 T.C. 1113, 1122 (1979), *aff'd*, 649 F.2d 264 (4th Cir. 1981). As we said in *Whitehouse Hotel Limited Partnership v. Commissioner*, 131 T.C. 112, 153 (2008), *vacated and remanded*, 615 F.3d 321 (5th Cir. 2010), "[t]he usefulness of the income approach diminishes . . . as the quality of the evidence of the income-producing potential of the property (usually evidence of its past performance) diminishes. It has been judged an unsatisfactory valuation method for property that does not have a track record of earnings."

[*26] property's highest and best use was as a construction aggregate mine, we look to whether such a use was financially feasible.

Petitioner argues that Mr. Meister has 45 years of industry experience, and his use of the income approach to determine the net present value of cashflows generated by the mineral resources at Green Valley property was compelling evidence of the property's use as a construction aggregate mine. Respondent disputes Mr. Meister's conclusions and points to the market study report performed by Mr. Reynolds. Respondent cites an error in Mr. Meister's report calculating 500,000 salable tons of construction aggregate per year. Respondent contends this error—reflected in the number of salable tons—was then carried forward by Mr. Meister and resulted in the overstatement of salable tons per year at a hypothetical Green Valley construction aggregate quarry mine.

When we closely examine the market report by Mr. Meister, we find he took some liberties in reaching his conclusions. We find entry into the construction aggregate market to be difficult due to the sensitivity of construction aggregate pricing and competition from large, experienced companies. Similarly, and after making some conservative adjustments to Mr. Meister's DCF, we find that his projected net present value decreases from $23 million to only $10 million and after further adjustments to his DCF the net present value is reduced to nearly zero.

Respondent's expert Mr. Taylor testified to some of Mr. Meister's errors and omissions. We find Mr. Taylor's testimony to be unbiased and convincing, as that of a geologist with the U.S. Department of the Interior. We also find the testimony of Mr. Messmer, a geologist with the Department of the Interior, to be compelling. Mr. Messmer has extensive experience in valuing mineral interests and has experience in the crushed stone or construction aggregate business. He opined that because gneiss rock formations are abundant in the region, the property is not unique and therefore a willing and informed buyer would not pay a premium for the property. He further opined that the Green Valley property does not hold a comparative advantage, assuming its highest and best use is as an aggregate quarry mine, over other land with known aggregate deposits.

We find that the market for the potential sale of construction aggregate at the Green Valley property would most likely be limited to buyers within a 30-mile radius of the proposed quarry as suggested by Mr. Messmer. Mr. Reynolds testified that potential customers for a

[*27] hypothetical quarry mine at the Green Valley property would include ready-concrete plants and asphalt plants. However, most of the concrete plants are 20 miles or more from the Green Valley property and some are 30 miles or more as shown by Mr. Reynolds in this diagram:[12]



Concrete Customer Locations: (detail in Addendum 4RM).

Mr. Reynolds's next diagram also showed the same with respect to the asphalt plants, many of which are least some 20 miles, and most 30 miles or more, from the Green Valley property as shown below:

---

[12] Mr. Meister's "diagram legend" lists the symbol "▲" for each concrete plant, but his diagram actually uses the symbol "■" for each plant.

[*28]



Asphalt Customer Locations (detail in Addendum 4A)

On the basis of Mr. Reynolds's own testimony and diagrams the majority of potential customers for a hypothetical construction aggregate quarry at the Green Valley property would be more than 20 miles away, either west toward the city of Greensboro or east toward the metropolitan region of Raleigh-Durham.[13]

We find the testimony of respondent's expert Mr. Messmer to be compelling. Mr. Messmer examined the local market, spoke with market participants, and concluded that abundant competition as well as the high transportation costs of aggregate were significant entrance barriers to the development of the Green Valley property into a construction aggregate quarry mine. The area surrounding the easement property is primarily rural. Chatham County has a small

---

[13] Moreover, Mr. Messmer testified that Greensboro is about 30 miles distant using U.S. Highway 421, while Raleigh is about 55 miles via U.S. Highways 421 and 1.

[*29] population and has experienced minimal growth leading up to the relevant period. In sum, we conclude it is more likely than not that the market would not support petitioner's experts' sales projections of 500,000 annual salable tons.

Although we do find evidence favoring the potential development of the Green Valley property as a construction aggregate quarry mine, we ultimately determine the record is insufficient to conclude that the proposed development of this property as a quarry mine is both financially feasible and maximally productive. *See 69.1 Acres of Land*, 942 F.2d at 292 (stating that in the absence of adequate proof to the contrary, a property's highest and best use is presumed to be its current use).[14] Accordingly, we conclude the highest and best use of the Green Valley property remains its current agricultural/residential/recreational use with knowledge of minerals on the site and the opportunity to seek entitlements allowing for mining on the site.

### C. *Valuation of the Property Before the Easement*

#### 1. *Legal Framework*

Unsurprisingly, "[t]his Court has repeatedly affirmed that actual arm's-length sales occurring sufficiently close to the valuation date are the best evidence of value, and typically dispositive, over other valuation methods." *Buckelew Farm, LLC v. Commissioner*, T.C. Memo. 2024-52, at *56; *see also ES NPA Holding, LLC v. Commissioner*, T.C. Memo. 2023-55, at *14; *Excelsior Aggregates*, T.C. Memo. 2024-60, at *31 ("The best evidence of a property's FMV is the price at which it changed hands in an arm's-length transaction reasonably close in time to the valuation date."); *Corning Place Ohio, LLC v. Commissioner*, T.C. Memo. 2024-72, at *28. For these purposes, both we and the U.S. Court of Appeals for the Eleventh Circuit have "f[ou]nd the purchase [of a partnership interest] reflective of the price that the market would pay for the Subject Property, especially when the ownership interest was nearly 100% and the only asset held by the Partnership was the Subject Property itself." *Buckelew Farm*, T.C. Memo. 2024-52, at *56; *see also TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1368 (finding that the sale price for a 98.99% interest in a partnership, whose only meaningful asset was property on which an easement was granted shortly

---

[14] As is, there is simply "'too high a chance that the property will not achieve the proposed use in the near future,' in which case 'the use is too risky to qualify.'" *TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1369 (quoting *Palmer Ranch Holdings Ltd. v. Commissioner*, 812 F.3d at 1000).

**[*30]** thereafter, was representative of the before easement value of the property); *Oconee Landing Prop., LLC v. Commissioner*, T.C. Memo. 2024-25, at *71–72, *supplemented by* T.C. Memo. 2024-73.

In addition to previous arm's-length transactions, we often draw on one or more of three approaches to determine the FMV of a piece of real property: (1) the market or comparable sales approach; (2) the income approach; and (3) a cost or asset-based approach. *See, e.g., Excelsior Aggregates*, T.C. Memo. 2024-60, at *32; *see also Bank One Corp. v. Commissioner*, 120 T.C. 174, 306 (2003), *aff'd in part, vacated in part, and remanded on another issue sub nom. JPMorgan Chase & Co. v. Commissioner*, 458 F.3d 564 (7th Cir. 2006). Our decision on which approach (or approaches) to use is a question of law, and the utility of the various approaches can vary with the type of property at issue. *See Chapman Glen Ltd. v. Commissioner*, 140 T.C. 294, 325–26 (2013); *see also Corning Place*, T.C. Memo. 2024-72, at *31; *Savannah Shoals, LLC v. Commissioner*, T.C. Memo. 2024-35, at *35. Using more than one approach can provide valuable sanity checks for all and for the values indicated by previous sales. *See Excelsior Aggregates*, T.C. Memo. 2024-60, at *32.

2. *Analysis*

a. *Other Relevant Transactions*

In 2011 Mr. and Mrs. Branch acquired the tract of land that includes the Green Valley property for approximately $3,685 per acre. Then, in 2013 Van Sant-Wingard issued an appraisal to Bonlee which valued the entire 607-acre tract including the Green Valley property at $22 million. Mr. Zdunczyk issued a mineral valuation report for Bonlee which concluded the pretax value of the crushed stone construction aggregate at the proposed Green Valley quarry was $6,662,680. In 2011 Mr. Branch sold 179.178 acres of land holding a mine plan and permit for mining of construction aggregate to Martin Marietta for $7.4 million or $41,361 per acre.[15] These prior market transactions offer some level of persuasive evidence of a before easement value for the Green Valley property.

---

[15] This sale by Mr. Branch to Martin Marietta also included a noncompete agreement which likely factored into the consideration paid.

**[\*31]**             b.        *Income and Comparable Sales Approaches*

In 2014 the Green Valley property had no zoning limits; however, neither did the property have a mining permit at the time the conservation easement was granted. On the basis of these factors and our highest and best use analysis above, we conclude for the tax year at issue that the Green Valley property retained its current agricultural/residential/recreational use with knowledge of minerals on the site and the opportunity to seek entitlements allowing mining of the site.[16] However, we also accept petitioner's contention that Mr. Branch held both the experience and knowledge to most likely obtain a mining permit from the North Carolina Department of Environment and Natural Resources and to develop the Green Valley property into a construction aggregate mine. This is not to say, however, that Mr. Branch had a financial incentive to do so.

Several expert witnesses expressed their views on the FMV of this property. First, we heard from Messrs. Meister and Clanton, who opined that the property, inclusive of its mineral resources, was valued at $23.9 million and $15.9 million, respectively. Both opinions conclude that the highest and best use for the property was as a (hypothetical) quarry mine. The major disparity in values is attributable to their DCF models. Mr. Meister used 500,000 tons in annual aggregate sales throughout, and Mr. Clanton used a range between 200,000 and 661,751 tons in annual aggregate sales. In short, we find these opinions to be speculative and not well supported.[17]

In rebuttal we also heard from respondent's expert witness Mr. Brigden who offered an opinion of FMV of $680,000, or $4,800 per

---

[16] Interestingly, only respondent offered an expert opinion as to the FMV of the Green Valley property on the basis of an agricultural/residential/recreational highest and best use.

[17] Even if we were to assume that the unencumbered easement property's highest and best use was as a quarry, the record would not support the claimed charitable contribution deduction. Significantly, none of petitioner's experts who testified at trial opined as to the FMV of the unencumbered easement property. Rather, they determined the net present value of the subsurface aggregate and ignored the regulatory definition of FMV. The regulations require us to determine FMV on the basis of the price that a willing buyer and a willing seller would agree to. Petitioner did not present any evidence that a prospective buyer of mining-use property would pay the net present value of aggregate for the land. We are not convinced that a quarry operator would pay the aggregate's net present value for the land as there would be no means for a profit. Petitioner's experts do not tell us what a quarry operator would pay for the land. *See Savannah Shoals*, T.C. Memo. 2024-35, at \*45.

**[*32]** acre, for the Green Valley property. However, Mr. Brigden seemed to contradict himself since he also testified that two land sales occurred in Chatham with the intention of conducting further mining of construction aggregate for $10,000 to $11,016 per acre. We therefore find Mr. Brigden's conclusion of value to be too conservative on the basis of his own report and the other evidence before us.

Lastly, we heard from Dr. Hamilton who opined a use value for the Green Valley property of $9,200 per acre, for a total value of $1.25 million. He testified that his analysis shows a "three price staging" for these types of properties (meaning property with potential as an aggregate mine): unpermitted land sales, permitted land sales, and operating quarry land sale prices. In this case, although it applied for one, the Green Valley property did not obtain a permit for mining construction aggregate, and we therefore conclude the unpermitted land sales examined by Dr. Hamilton to be the most relevant in our analysis here.

With the foregoing in mind, we find ourselves compelled to rely on the conclusions reached by some (or several) of the expert witnesses. Having previously rejected a highest and best use of mining for the Green Valley property, we will equally refrain from accepting a DCF income approach to value which assumes an "operating quarry" exists on the land. Thus, the conclusions offered by petitioner's experts— namely that the before easement FMV of the Green Valley property was either $23.9 million or $15.9 million—are rejected. Having rejected the DCF approach, we find there is no support for petitioner's contention that the Green Valley property's FMV as of December 30, 2014, was some $22.8 million or more than $160,000 per acre.[18] After considering all of the evidence presented, we find that there is no market transaction supporting such a conclusion using the sales comparison approach to value.

Rather we accept the sales comparison approaches to value offered by respondent's experts, namely Messrs. Brigden and Hamilton. Having concluded the Green Valley property's highest and best use was agricultural/residential/recreational with knowledge of minerals on the site and the opportunity to seek entitlements allowing for mining at the

---

[18] It is puzzling how in 2013 the entire tract could be worth $22 million as stated in the first Van Sant-Wingard appraisal, and then in 2014, after the parent tract was subdivided into the four Green Valley, Vista Hill, Tick Creek Holdings, and Big Hill tracts, each of the parcels alone was then worth $22 million. This result seems illogical.

**[\*33]** site, we conclude that a per-acre price ranging from $9,200 to $11,016 is more likely than not on the basis of the evidence before us. Therefore, we will conclude our analysis[19] and arrive at an average per-acre price of $10,072 per acre as the most likely FMV before the conservation easement granted over 136.12 of the total 141.65 acres. The result is a before easement (rounded) value as of December 30, 2014, for the Green Valley property ranging between $1,371,000 and $1,426,699.[20]

D.    *Value of the Property After the Easement*

Petitioner presented evidence from Mr. Clanton, who offered an after easement value of $250,000 for the Green Valley property as of December 31, 2014. At trial and again on brief respondent stipulated this after easement value determination offered by petitioner. We find this stipulation to be well supported, and therefore we accept that the FMV of the Green Valley property was $250,000 after the granting of a conservation easement.[21]

III.    *Penalties*

A.    *Compliance with Section 6751(b)*

Section 6751(b)(1) provides: "No penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the

---

[19] Since we have previously determined in our Order served on May 27, 2021, that Green Valley is not entitled to a charitable contribution deduction on the basis of language found in the deed of conservation, we find it necessary to determine only a reasonable estimate of the before easement value for the Green Valley property to determine whether there is a "substantial valuation misstatement" and a "gross valuation misstatement" resulting in penalties under section 6662.

[20] The difference in values is attributable to whether you view the value over the entire 141.65-acre tract or the 136.12-acre portion over which the conservation easement was granted.

[21] On the basis of the foregoing before and after easement FMVs, Green Valley would be entitled to a charitable contribution deduction under section 170 of $1,121,000 for its donation to TLC of a conservation easement over approximately 136.12 acres. However, we have previously determined in our May 27, 2021, Order that the conservation easement deed relating to each of the Partnerships fails to comply with Treasury Regulation § 1.170A-14(g)(6). Accordingly, we have determined that the Partnerships are not entitled to claim noncash charitable contribution deductions for the tax years at issue.

**[\*34]** individual making such determination or such higher level official as the Secretary may designate."

The Commissioner's noncompliance with section 6751(b) is a partnership-level defense. Parties in a partnership-level case may raise noncompliance with section 6751(b) as a defense. *Dynamo Holdings*, 150 T.C. at 231.[22] Petitioner has disputed respondent's compliance with the supervisory approval requirement of section 6751(b)(1) with respect to the accuracy-related penalties under section 6662 determined in the FPAAs. We are therefore compelled to address whether respondent complied with section 6751(b)(1) in making his penalty determinations.

Petitioner contends the evidence reflects that Mr. Philipp, the manager of Ms. Bradley, made the initial determination to assert penalties in these cases. Petitioner cites the internal Appeals memorandum drafted by AO Berry to his manager, reflecting statements made by Mr. Philipp at the Appeals conference that were contemporaneously recorded by AO Berry. In sum, petitioner contends respondent has not complied with section 6751(b)(1).

It is true that retired revenue agent Ms. Bradley did not recall the specifics relating to the audits of the Partnerships and her processes relating to supervisory approval some six years later while testifying at trial. After considering the corroborating evidence including Ms. Bradley's contemporaneous handwritten notes and her emails to Mr. Nixon—a penalty specialist with IRS—as well as the corroborating testimony from Mr. Philipp and AO Berry, there is simply insufficient evidence to conclude that respondent did not comply with section 6751(b) in these cases with respect to the accuracy-related penalties being asserted herein.

Petitioner further contends Ms. Bradley failed to seek prior supervisory approval of the section 6662(h) penalties being asserted against the Partnerships, and this lack is evidenced by the discrepancies found in her April and May 2017 Penalty Lead Sheets and Mr. Phillip's

---

[22] In *Dynamo Holdings*, 150 T.C. at 231–32, we also held that the Commissioner has no burden of production under section 7491(c) with respect to a penalty asserted against a partnership. *See* I.R.C. § 7491(c)(1) (placing burden of production on the Secretary with respect to the liability "of any individual" for any penalty). Therefore, in a TEFRA partnership proceeding such as this respondent does not bear the burden of production under section 7491(c)(1), and petitioner maintains the burden of proving that no penalty should apply. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. at 115; *NT, Inc. v. Commissioner*, 126 T.C. 191, 194–95 (2006); *Higbee v. Commissioner*, 116 T.C. 438, 446–47 (2001).

[*35] physical signature on June 12, 2017. Respondent disputes this finding on the basis of Mr. Philipp's digital signature and email approving Form 5701 completed by Ms. Bradley which included the section 6662(h) penalties. We agree in part and find Mr. Philipp's subsequent physical signature on the May 2017 Penalty Lead Sheets to be a subsequent or additional approval that had already been given in April. In sum, the evidence supports a finding that the penalties in the initial Penalty Lead Sheets, namely section 6662(c), (d), and (e) penalties, were approved on April 4, 2017, by Ms. Bradley's immediate supervisor Mr. Phillip when he signed the initial Penalty Lead Sheets, and the section 6662(h) penalty was also approved by Mr. Phillip, when he signed Form 5701 on April 4, 2017, and when he signed the Letters 1807 on April 19, 2017.

The instant cases are presumably appealable to the Fourth Circuit. This court of appeals has not squarely addressed the question of when supervisory approval must be secured.[23] Some appellate courts have ruled that approval is timely if secured later in the process and before the tax is assessed or (in some circumstances) before the Notice of Deficiency is mailed. *See, e.g.*, *Kroner v. Commissioner*, 48 F.4th 1272, 1278 (11th Cir. 2022), *rev'g in part* T.C. Memo. 2020-73; *Wells Fargo & Co. v. United States*, 957 F.3d 840, 854 (8th Cir. 2020) ("By its terms, [section 6751(b)(1)] requires prior written approval to be obtained when the government 'assesses' a penalty against a taxpayer."). Although respondent cites these opinions, respondent acknowledges it is not necessary to decide the issue here because respondent obtained approval before the first formal communication of the initial determination. *See* I.R.C. § 6751(b)(1). We agree, in part, with respondent's position.

We determine that in compliance with section 6751(b) Ms. Bradley timely obtained approval from her immediate supervisor Mr. Phillip in each of these consolidated cases as to section 6662(c), (d), (e), and (h) penalties. Ms. Bradley included these penalties in her initial determination and ultimately obtained supervisory approval, evidenced through Mr. Phillip's electronic signatures on the initial Penalty Lead Sheets and Forms 5701 on April 4, 2017, and the Letters 1807 on April 19, 2017, which were sent to petitioner on or after April 19, 2017. *See Graev v. Commissioner*, 149 T.C. 485, 498 (2017), *supplementing and*

---

[23] In *Brooks v. Commissioner*, 109 F.4th at 205, although the Fourth Circuit indicated managerial approval was required before the IRS could assess such a penalty, we find respondent's compliance with section 6751(b)(1) was not an issue raised on appeal and before the court of appeals.

**[\*36]** *overruling in part* 147 T.C. 460 (2016). We find the error by Ms. Bradley—in excluding section 6662(h) penalties on the initial Penalty Lead Sheets—to be harmless, since Mr. Phillip had approved all penalties, no later than April 19, 2017.

### B. *Section 6662 Accuracy-Related Penalties*

In each of the four FPAAs respondent has asserted accuracy-related penalties against the Partnerships. More specifically, respondent asserts the Partnerships are liable for penalties under section 6662(c), (d), (e), and (h).[24] Pursuant to agreement between the parties we will herein examine the application of penalties as to Green Valley and any reasonable cause defense asserted, which by agreement, will be binding on the remaining three Partnerships.

### 1. *The Gross Valuation Misstatement Penalty*

Respondent asserts a 40% penalty against Green Valley under section 6662(e) and (h) for a gross valuation misstatement.

The Code imposes a penalty for "the portion of any underpayment [of tax] which is attributable to . . . [a]ny substantial valuation misstatement." I.R.C. § 6662(a), (b)(3). A misstatement is "substantial" if the value of the property claimed on a return is 150% or more of the correct amount. I.R.C. § 6662(e)(1)(A). The penalty is increased to 40% in the case of a "gross valuation misstatement." I.R.C. § 6662(h). A misstatement is "gross" if the value of property claimed on the return exceeds 200% of the correct amount. I.R.C. § 6662(h)(2)(A)(i).

Since the charitable contribution for the Green Valley property originally claimed on the return was $22.5 million—which is well in excess of 200% of the amount determined here by this Court—we find that the value reported by Green Valley is a "gross valuation misstatement." This finding triggers application of the 40% gross

---

[24] Respondent also seeks a 20% penalty for any underpayment due to a reportable transaction understatement arising from conservation easements' being a listed transaction. *See* I.R.C. § 6662A. However, in an earlier report, *Green Valley Investors, LLC*, 159 T.C. 80, we granted petitioner's Motion for Partial Summary Judgment, setting aside Notice 2017-10 (the notice making conservation easements a listed transaction) as invalid since it was not promulgated pursuant to the Administrative Procedure Act. Since Notice 2017-10 has been set aside—and notwithstanding the fact the gross valuation misstatement penalty applies here—we determined the reportable transaction understatement penalty may not be imposed in these consolidated cases.

**[\*37]** valuation misstatement penalty under section 6662(e)(1)(A) and (h) to those portions of the 2014 underpayment attributable to a value claimed that is in excess of the determined value.

Generally, an accuracy-related penalty is not imposed if the taxpayer demonstrates "reasonable cause" and shows that he "acted in good faith with respect to [the underpayment]." I.R.C. § 6664(c)(1). This defense may be available where a taxpayer makes a "substantial" valuation overstatement with respect to charitable contribution property. *See* I.R.C. § 6664(c)(3) (second sentence). This defense, however, is not available where the overstatement is "gross." *See* I.R.C. § 6664(c)(3) (first sentence). Consequently, we will sustain the 40% gross valuation misstatement penalty imposed by respondent, and we do not need to address any potential reasonable cause defense by Green Valley since none could apply to this penalty. *See* I.R.C. § 6664(c)(3); *Chandler v. Commissioner*, 142 T.C. 279, 293 (2014).

2. *Substantial Understatement and Negligence Penalties*

Next, respondent seeks to impose an accuracy-related penalty under section 6662(c) and (d), which imposes a 20% penalty if any part of the underpayment of tax is due to a substantial understatement of income tax or to negligence. This penalty would apply to what might be called the "lower tranche" of the underpayment, i.e., the portion of the underpayment by Green Valley that was not attributable to a valuation misstatement. *See Oconee*, T.C. Memo. 2024-25, at \*75 (citing *Plateau Holdings, LLC v. Commissioner*, T.C. Memo. 2021-133, at \*2). While the determination of an "underpayment" within the meaning of section 6662(a) cannot be made at the partnership level, *see Plateau Holdings*, T.C. Memo. 2021-133, at \*4, we can, however, determine at the partnership level the applicability of the penalty, *see Dynamo Holdings*, 150 T.C. at 233; *Oconee*, T.C. Memo. 2024-25, at \*75. The Commissioner has no burden of production with respect to penalties in a TEFRA partnership action. *Dynamo Holdings*, 150 T.C. at 236. Thus, the burden of showing that the negligence penalty does not apply—including the availability of any defenses—is on petitioner. *See id.* at 236–37.

One possible ground for claiming "reasonable cause" is reliance on professional advice. Treas. Reg. § 1.6664-4(b). "If a taxpayer alleges reliance on the advice of a tax professional, that 'advice must generally be from a competent and independent advisor unburdened with a conflict of interest and not from promoters of the investment.'" *Oakhill*

[*38] *Woods, LLC v. Commissioner*, T.C. Memo. 2020-24, at *29 (quoting *Mortensen v. Commissioner*, 440 F.3d 375, 387 (6th Cir. 2006), *aff'g* T.C. Memo. 2004-279); *see Gustashaw v. Commissioner*, 696 F.3d 1124, 1139 (11th Cir. 2012), *aff'g* T.C. Memo. 2011-195. "Advice hardly qualifies as disinterested or objective if it comes from parties who actively promote or implement the transactions in question." *Stobie Creek Invs. LLC v. United States*, 608 F.3d 1366, 1382 (Fed. Cir. 2010). "A taxpayer advancing a reliance-on-professional-advice defense must also show that it actually relied in good faith on the advice it received." *Oakhill Woods*, T.C. Memo. 2020-24, at *29; *see also Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 98–99 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002).

"Negligence has been defined as lack of due care or failure to do what a reasonably prudent person would do under like circumstances." *Mill Road 36 Henry, LLC v. Commissioner*, T.C. Memo. 2023-129, at *70 (citing *Ocmulgee Fields, Inc. v. Commissioner*, 132 T.C. 105, 123 (2009), *aff'd*, 613 F.3d 1360 (11th Cir. 2010)). It "includes any failure to make a reasonable attempt to comply with the provision of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a tax return." Treas. Reg. § 1.6662-3(b)(1).

With respect to petitioner's reasonable cause defense we look to Green Valley's tax matters partner and petitioner, Mr. Branch. Petitioner contends he relied on his paid professionals and his reliance was justified on the basis of his level of formal education. And while we are willing to accept that petitioner may be unsophisticated with respect to tax matters, we find him to be sophisticated with respect to the acquisition of land and development of quarry mines in North Carolina. Petitioner testified he has obtained mining permits, developed mines, and sold land developed for mining for many years. We also find him to be knowledgeable in the sale of construction aggregate, going so far as claiming an annual need for his own businesses to exceed 100,000 tons.

Looking to the actions of petitioner we find he fails to establish reasonable cause. While this Court may be willing to accept the premise that a single hypothetical construction aggregate quarry could be opened at the Green Valley site, it remains beyond comprehension that three adjoining mines—namely Big Hill, Tick Creek Holdings, and Vista Hill—could equally be developed as mining properties in 2014 and 2015. It is likewise difficult to accept that Mr. Branch, who acquired the underlying 607 acres of land for some $2,500 an acre or approximately $2.2 million, could objectively conclude that just three years later this

[*39] same property was in fact worth more than $160,000 an acre for a total collective value of $91 million. On the basis of the record before us we find petitioner has failed to establish that he exercised ordinary business care and prudence in claiming these properties had an FMV of anywhere near $91 million,[25] which in turn would support the overall claimed charitable contribution deductions of some $90 million by the Partnerships.[26]

In sum, the facts establish that the accuracy-related penalties for a substantial understatement of income tax, *see* I.R.C. § 6662(a), (b)(2), and the negligence penalty, *see* I.R.C. § 6662(a) and (b)(1), both apply (in the alternative) to the "lower tranche" of Green Valley's underpayment.[27]

IV.    *Conclusion*

For tax year 2014 we hold Green Valley is liable for a 40% gross valuation misstatement penalty under section 6662(h)(1) and (2)(A)(i) for that portion of the underpayment attributable to a value claimed that is more than the value determined herein. For tax year 2014 we further hold Green Valley is liable for an accuracy-related penalty of 20% under section 6662(c) and (d) to apply (in the alternative) to the "lower tranche" of Green Valley's underpayment.[28]

We have considered all of the arguments that the parties have made, and to the extent they are not addressed herein, we find the arguments to be moot, irrelevant, or without merit.

To reflect the foregoing,

*An appropriate order will be issued.*

---

[25] The total before easement FMVs claimed on the Partnerships' 2014 and 2015 returns equal approximately $91 million.

[26] The total charitable contribution deductions claimed on the Partnerships' 2014 and 2015 returns relating to the conservation easements equal approximately $90 million.

[27] We note that these conclusions do not preclude a partner's raising penalty defenses during a subsequent partner-level proceeding. *See Dynamo Holdings*, 150 T.C. at 233 (citing I.R.C. § 6230(a)).

[28] Big Hill, Tick Creek Holdings, and Vista Hill have agreed to be bound by our penalty determinations in this case. This lower tranche penalty is predicated on our prior determination that the Partnerships are not entitled to claim noncash charitable contribution deductions for the tax years at issue.